## GENERAL MOTORS CORPORATION v. SWAN CARBURETOR CO. (two cases).
## REEKE-NASH MOTORS CO. v. SAME.
### Nos. 6933, 7108, 7102.

Circuit Court of Appeals, Sixth Circuit.
Jan. 12, 1937.

As Amended April 14, 1937.

878

In Nos. 6933 and 7108:

John M. Zane, of Chicago, Ill., and Drury W. Cooper, of New York City (Harold W. Norman, of Chicago, Ill., Allan C. Bakewell, of New York City, Lawrence C. Spieth, of Cleveland, Ohio, Zane, Morse, Zimmerman & Norman, of Chicago, Ill., Cooper, Kerr & Dunham, of New York City, and Cannon, Spieth, Taggart, Spring & Annat, of Cleveland, Ohio, on the brief), for appellant.

William H. Boyd and F. O. Richey, both of Cleveland, Ohio (Richey & Watts, Boyd, Brooks & Wickham, F. M. Bosworth, and E. D. McCurdy, all of Cleveland, Ohio, on the brief), for appellee.
In No. 7102:

Charles Neave, of New York City (J. L. Stackpole and H. L. Kirkpatrick, both of Boston, Mass., and Cannon, Spieth, Taggart, Spring & Annat, of Cleveland, Ohio, on the brief), for appellant.

F. O. Richey, of Cleveland, Ohio (F. M. Bosworth and Richey & Watts, all of Cleveland, Ohio, on the brief), for appellee.

Before HICKS, SIMONS, and ALLEN, Circuit Judges.

ALLEN, Circuit Judge.

These are appeals arising out of separate litigation instituted by the appellee involving two patents, Nos. 1,536,044, and 1,636,721, issued to John W. Swan, the dates of issue being September 28, 1925, and July 26, 1927, respectively, each patent relating to improvements in manifolds for use in internal combustion engines. The original application, upon which the second patent issued, was filed September 17, 1921. The first patent was issued upon an application filed November 5, 1924, as a continuation of the earlier application "in so far as matter common to the two cases is concerned." Appeals Nos. 6933 and 7108 arise out of an action at law for royalties alleged to be due under a written license contract, and appeal No. 7102 arises out

of an action for infringement of various claims of both patents. Appeal No. 7108 in the royalty case is based upon denial of appellant's cross-bill for reformation. The royalty case was submitted to a jury which returned a verdict of $621,560.24 in favor of appellee, upon which judgment was rendered. In the infringement case, evidence was taken before a special master, who upheld the validity of the claims in suit, and found them to be infringed. The report of the special master was confirmed by the District Court.

Both patents relate to means for facilitation of the distribution of fuel in internal combustion engines. In an internal combustion engine it is the function of the carburetor to mix the gasoline with air in the proper ratio so that the mixture may be efficiently transmitted to the cylinders and there exploded, thus supplying the motive power. The manifold connects the carburetor and the cylinders, and conveys the fuel mixture from the carburetor to the cylinders. It consists "of three distinct features: (1) A pipe, called a riser, leading vertically from the carburetor; (2) a horizontal pipe, called a header, above said riser; and (3) branches, three in number for a six-cylinder engine, leading from the header, one at each end and one in the middle to the cylinder ports and, intake valves of the engine." Swan Carburetor Co. v. General Motors Corp., 42 F.(2d) 452, 454 (D.C.Ohio).

A branch may supply fuel to one or more cylinders, in which case the branch is said to be "siamesed." In the six-cylinder engine to which these patents in general apply, there are three branches, all "siamesed."

When the engine is operating, each aspiration of the cylinders draws the fuel mixture from the carburetor through the manifold, the mixture passing in succession through riser, header and branches. The particular problem claimed to have been solved by Swan was emphasized by the rapid increase in the production of gasoline from 1900 on, and the change in quality of gasoline resulting from the development of the oil-cracking process. Originally gasoline was derived from crude oil by distillation. Later, when consumption increased, gasoline was derived by subjecting the crude oil to immense heat and pressure, that is to say, "cracking" it. The gasoline obtained from this process contains additional oils of low volatility, and is more impure than distilled gasoline.

When mixed with the air in the carburetor, it tends not to vaporize completely; that is, in passing from the carburetor to the cylinders, so-called "wet" particles of gasoline tend to adhere to, or "puddle" on the sides of the manifold. This not only disturbs the ratio of air and gasoline in the mixture, but also causes unequal distribution of the fuel to the various cylinders. When the fuel is unequally distributed, various evils ensue. Too rich a mixture in a cylinder causes carbonization and deformation of the combustion chamber, and results in limitation of performance. Too lean a mixture causes lack of power and deterioration of the valve material.[1] These difficulties are enhanced by the increase in the number of cylinders, because a problem of secondary distribution arises. The old type of manifold which had operated relatively satisfactorily with gasoline secured by distillation was not competent to cope with the impurities and lower volatility of gasoline obtained by the "cracking" process. The problem defied solution for a number of years.

Swan thought that if he could bring the fuel mixture from the carburetor to the header in rectilinear lines, and then abruptly change its course at right angles in the header, and then again change its course at right angles from the header into the branches, all obstructions, curves or recesses in the longitudinal line of travel being eliminated, the incompletely vaporized particles of gasoline instead of depositing at one place and there adhering, would be thrown into the stream of mixture and vaporized. His theory was that the sharp right-angled turns created an area of turbulence or a mixing zone at each change of direction, thereby revaporizing the mixture before it reached the engine ports, and that as a result of this the

branches would receive an equal distribution of the fuel. In patent No. 1,536,044, the first ten claims are method claims, of which 4 is typical,[2] and the remaining are article claims.[3]

These claims do not specify the form of cross-section. Swan indicated in his specifications that while the preferred form of manifold was square or rectangular in cross-section, the branches might be round, hexagonal, octagonal, or any other cross-sectional shape. The drawings disclose a branch with the inside angle of the turn sharp and the outside rounded.

Patent No. 1,636,721 presents eight apparatus claims. It also describes a manifold of preferably square construction, but allows the tapering of the end portions of the branches. The square cross-section, the flat bottom of the header, and the abrupt bends, preferably at right angles, are stressed throughout the specifications.

On June 6, 1923, prior to the issuance of either patent, but after the filing of the first application, a license contract was made between appellant General Motors Corporation and Swan Carburetor Company, exclusive licensee of Swan, and later assignee, granting a license to make, use and sell Swan's improvements in manifolds throughout the United States and Territories, and in "all foreign countries in which letters patent therefor may be granted, under or corresponding to the aforesaid application of John W. Swan for United States letters patent and under any or all letters patent that may issue on said application or any division or continuation thereof." After patent No. 1,536,044 was issued, but prior to the issuance of patent No. 1,636,721, an action similar to the instant royalty case and between the same parties was brought upon

[1] The proper ratio of mixture is given as one part gasoline to sixteen parts air by weight (10,500 to 1 by volume).

[2] "4. A method of distributing a fuel mixture to an engine which consists in moving the mixture in a straight line to a zone from which it is distributed to a plurality of engine cylinders, directing said movement by forces which tend to distribute the mixture uniformly in all directions in a plane transverse to said movement, and further directing the movement of the mixture by forces tending to move it successively in a plurality of directions transverse to the original direction, to the cylinders."

[3] Typical of the article claims is 20:

"In an inlet manifold, a distributing chamber having a single inlet conduit and three branch conduits, one of the walls of the chamber being opposite the inlet duct and symmetrically formed and situated with reference to the branch ducts so that entering fluid may be influenced by said wall uniformly in all directions transverse to the entering stream, and the branch conduits being of substantially uniform shape throughout and at any turn thereof presenting similar walls shaped and situated so that passing mixture may be influenced thereby in a manner to distribute equally to cylinders to which said turns may lead."

this license contract, Swan Carburetor Co. v. General Motors Corp., supra. In that case General Motors Corporation claimed that it had bound itself to pay royalties only on the specific construction disclosed in Swan's first application, and that as the manifolds in suit were round in form, they were not covered by the license agreement. Jury trial was waived and the case was tried to the court, which held that while the Swan manifold was preferably square in cross-section, it did not exclude the round cross-section form, and that Swan was entitled to a variation in shape such as that exhibited by the manifolds in suit. General Motors Corporation also claimed that patent No. 1,536,044, the only patent then issued, was not covered by the license contract inasmuch as it was not issued upon the application, No. 501,314, therein referred to, but was issued upon the second application. The court held that the second application was a continuation of application 501,314 in matters common to the two applications, and gave judgment for royalties upon the manifolds in suit holding that they were constructed under the teachings of patent No. 1,536,044. This judgment was affirmed by this court upon a procedural question. General Motors Co. v. Swan Carburetor Co., 44 F.(2d) 24.

Royalty Case (Nos. 6933 and 7108).

In the royalty case, the manifolds for which royalties were claimed were made during the years 1926, 1927, 1928, 1929, and the first quarter of 1930, and were used on Chevrolets, Pontiacs, Oldsmobiles, Oaklands, Buicks, and various trucks. The petition alleged that by reason of the adjudication in the former action for royalties between the same parties (Swan Carburetor Co. v. General Motors Corp., supra), "all questions between the parties hereto as to the defendant's [appellant's] liability to pay plaintiff [appellee] royalties on the said manifolds" had been adjudicated. It averred that under the license contract in the former case, royalties were claimed and adjudged to be due upon certain Buick manifolds; that some of the manifolds in suit were identical with the Buick manifolds recovered for in the former case, and that the remainder of those in suit were substantially identical with the Buick manifolds recovered for in the former action, and that appellant thereby was obligated to pay the royalties in question. In the former royalty action appellee had relied for recovery solely upon patent No. 1,536,044, issued upon the continuation application. In the present action, appellee relied upon both patents, but during the trial abandoned reliance upon patent No. 1,636,721. Appellant in its answer denied the identity or substantial identity of the manifolds in suit with the Buick manifolds involved in the former action, denied the effect of the former adjudication, and alleged that the present action was a different cause of action from the former royalty action. The answer also set up defenses under the prior art, claimed an estoppel as to patent No. 1,536,-044 because of proceedings in the patent office, claimed an estoppel arising out of appellee's representations as to the kind of manifolds covered by the contract, and set up affirmative defenses arising out of the terms of the contract itself.

No. 7108.

In an amended answer, appellant prayed for reformation of the license contract so as to restrict it to square cross-sectional manifolds.[4] Appellant then moved the court to set the reformation branch of the case

---

4 Defendant's [appellant's] Second Amended Answer.

"3. And the defendant alleges that under the prior art existing at the time of the making of said agreement and of the representations of plaintiff as to said invention hereinafter alleged, manifolds, containing inside curved surfaces, with curved and right angled turns within the manifold, were well known and before the making of the agreement aforesaid, the plaintiff, in order to induce the defendant to enter into the said agreement, represented and stated to the said defendant that the said application was for, and the invention was, an improvement upon the prior art in that, while it involved a riser, a header, and branches, well known in the art, the invention consisted of having flat level surfaces over which the particles might roll and all its pipes were of rectangular or square construction, making right angled rectangular turns within the manifold resulting therefrom and that the essence of the said invention consisted of the pipes of the manifold of rectangular section requiring right angled rectangular turns in the pipes, setting up at every turn a violent turbulence and that the said application covered only such a rectangular construction and no other, and that the said agreement was intended to cover and did cover, in licensing and in requiring payment of royalties, only such rectangular construction of pipes and right angled rectangular turns within the

down for hearing by the court "as a court of equity," and later in an amendment to its second amended answer prayed that "it may be adjudged by the Court that the equities are with the defendant [appellant] and that the plaintiff [appellee] is estopped from claiming that the contract sued upon in this action extends beyond the description of manifolds mentioned in the above plea as the subject of the contract; and that the said contract be reformed so that the contract shall extend only to the class of manifolds mentioned in the above plea as the subject of the contract; and that the plaintiff [appellee] cannot recover for any of the manifolds sued for in this cause"; and for other equitable relief. The District Court found that appellant was not entitled to reformation of the contract and limitation thereof by estoppel, or other equitable relief as prayed for in its second amended answer, and dismissed the cross-bill.

It was in brief appellant's contention on the point of reformation that appellee, previous to and at the time of the making of the written contract, had represented that Swan's invention was limited to manifolds of rectangular construction, with flat surfaces making sharp right-angled turns within the manifold, and that hence appellee was estopped to claim that the written contract related to manifolds of round cross-section construction such as appellant's manifolds in suit. Appellant also contended that it had entered into the license contract relying on these representations that the invention was thus limited, that appellee knew of appellant's belief, and that hence appellant was entitled to reformation of the written contract between the parties.

We think the District Court was correct in its finding and decree on this issue. It is elementary that reformation of an instrument will not be granted in absence of mutual mistake of the parties, fraud or misrepresentation inducing the contract, or such silence on the part of the favored party that equity considers there is a duty to speak. Moreover, evidence to justify reformation must be clear and

said manifold, and the said application at said time described as said invention such rectangular construction; that the said defendant believed the said representations of the plaintiff to be true, and believed that the said license covered only rectangular pipes and right angled rectangular turns and no other, and relied upon said representations as true in executing the said agreement and was induced thereby to execute it; that the said plaintiff then and there well knew that said defendant relied upon said rectangular construction, as being the said invention, in entering into said agreement and induced and allowed said defendant to remain in said belief and to enter into said agreement in said belief, and it would be a fraud upon defendant to extend said application or said agreement to cover round pipe construction of said manifold and the plaintiff is estopped from so contending; that at the time of executing said agreement there was but one claim allowed upon said application, and that claim was based wholly on flat surfaces in the line of travel through the manifold;

"And the defendant further alleges that in addition to the representations hereinbefore stated, the plaintiff represented to the defendant prior to and at the time the license contract sued upon in this action was being negotiated and made, in order to induce the defendant to enter into said royalty agreement, that the said application then and there being exhibited to defendant had been filed in the patent office and described a new and original invention and that the inventor was entitled to a patent therefor and that said plaintiff had full title to said application and invention; that as to any construction except only a square or rectangular construction throughout the said representations were not true and were then and there false and known to the plaintiff to be false; that in fact invention as to any round construction in cross section the said plaintiff had no title to and such round construction was not a new and original invention and as to such round construction the plaintiff had theretofore parted with title, and in addition thereto for more than two years prior to filing said application said round construction with right angled corners had been publicly used by the inventor thereof and, if ever valid, had been abandoned to the public, and such facts were known to the said plaintiff at the time of said negotiations for said royalty agreement and were concealed and suppressed from the defendant, and the defendant relied in entering into said royalty agreement and its stipulations upon the representations so made by plaintiff as true, and if it had not so relied thereon, it would not have entered into said royalty agreement, and by reason of the facts aforesaid the plaintiff is estopped from claiming that any construction except the square or rectangular construction was covered by said royalty agreement."

convincing. Philippine Sugar Estates Development Co., Ltd., v. Government of Philippine Islands, 247 U.S. 385, 38 S.Ct. 513, 62 L.Ed. 1177; Finance Co. of America v. Lamson Brothers Co., 78 F.(2d) 515 (C.C.A.6); Equitable Life Assur. Soc. of U. S. v. Johnson, 81 F.(2d) 543 (C.C.A.6).

Appellant claimed that by the reference to the first application made in the license contract, a term was written into the contract limiting the invention covered thereby to flat bottom or square cross-section manifolds. If no antecedent agreement that the manifolds covered by the license are to be of square cross-section only is shown to exist, the contract cannot be reformed to include such a provision. Cf. Shell Petroleum Corp. v. Corn, 54 F.(2d) 766 (C.C.A.10). Here the existence of such an antecedent agreement is contradicted both by the contract itself and by all of the facts surrounding its execution. While the contract specifically refers to application No. 501,314, this application provides for round branches and for optional forms. Also the contract specifically covers the continuation application which expressly provided for optional round forms. Under familiar principles, these writings incorporated by reference into the license contract carry more weight than the declarations of the parties to the contract made several years subsequent to its execution.

The circumstances under which the agreement was signed conclusively negative the existence of an agreement that it should relate only to flat bottom or square cross-section manifolds. Two months prior to the filing of his original application, Swan endeavored to interest the Buick Company in his manifolds. As early as June, 1922, the president of appellee went to appellant's patent counsel at the suggestion of the president of the Buick Company, and explained Swan's principle and made drawings illustrating his theory. Swan secured the co-operation of General Motors Corporation in testing and perfecting his manifolds as well as in obtaining access to the patent library of the National Automobile Chamber of Commerce. About the same time (February, 1923) patent counsel for General Motors Corporation were making an independent search into the prior art to determine the scope of Swan's invention. The contract was entered into only after the fullest disclosure, and after appellant had opportunity to observe appellee's device for a period of nine months.

Appellee's patent attorney submitted a draft of the contract at the conference of June 6, 1923, which was changed materially at appellant's request. This fact indicates that appellant carefully considered the contract, redrafted it, and executed it with deliberate forethought. The contract in final draft was in appellant's possession until June 19, 1923, when it was duly executed.

Appellant was represented by experienced counsel. With knowledge at least equal to that of appellee it entered into an agreement concerning a patent possibly to be issued in the future, the full terms of which, if issued, were uncertain and problematical. Appellant specifically agreed that the contract should cover claims allowed under divisional or continuation applications. It chose to gamble on the result, seeking to obtain a low royalty on a future patent rather than to be forced to pay a possibly higher royalty on an issued patent. It may not now complain because broad claims were secured under the application. As the patent is broad, appellant has received a correspondingly broad license. At the time of the execution of the contract both parties knew that the application for patent was subject to amendment, and that the exact form of the invention was uncertain. The original application covered optional forms. The continuation application specifically authorized round or hexagonal forms. It is not to be overlooked that the defense of misrepresentation raised in the second amended answer on October 14, 1931, is presented some eight years after the license contract was executed. While it would have been natural for appellant to file a cross-bill praying for reformation in 1925, when appellee filed the first suit on the license contract, if in fact there had been such an antecedent agreement as is now claimed, no such question was then made.

Considering that this application, with its optional forms, was studied by appellant's expert patent attorneys for weeks prior to the execution of the license contract, and that the contract providing for divisional or continuation applications was held for a number of days prior to its execution, we think the District Court was correct in its finding that there was no misrepresentation as to the meaning of these express terms. Cf. Fulton v. Colwell, 112 F. 831 (C.C.A.3). This is not a case where an antecedent agreement is shown to have been omitted by mutual mistake or

mistake on one side and bad faith on the other, as in Finance Co. of America v. Lamson Brothers Co., supra. Cf. Connecticut Fire Ins. Co. v. Oakley Improved Bldg. & Loan Co., 80 F.(2d) 717 (C.C.A. 6). Rather is this a case where the parties deliberately contracted with reference to a future fact, uncertain in detail and realized somewhat differently from what the parties expected. Cf. Moffat Tunnel Improvement Dist. v. Denver & S. L. Ry. Co., 45 F.(2d) 715 (C.C.A.10). The writing accurately expressed the agreement, even if appellant was mistaken so far as the scope of the patent was concerned. Shell Petroleum Corp. v. Corn, supra.

The decree on the question of reformation is affirmed.

## No. 6933.

■ Appellant contends that having ruled against it on the prayer for reformation, the court should have submitted to the jury questions as to ambiguity of the contract and of estoppel based upon misrepresentation. Since appellant itself had moved the court to reform the contract based upon the very circumstances now relied upon and since the court's decree ruled specifically thereon, and no other representations antedating formation of the contract are asserted, this contention has no merit. The appellant may not now obtain by construction the relief already denied upon its prayer for reformation upon identical circumstances already adjudicated.

Appellant's principal contention in the law case is that the court erred in its view of the effect of the judgment in the first royalty case (Swan Carburetor Co. v. General Motors Corp., supra), including its ruling as to the construction of the license contract, its charge upon that question, its submission to the jury of the issue of identity between the manifolds, and its exclusion of evidence of the prior art. Exceptions were properly saved upon all these points.

It was the court's view that as the former and the instant royalty cases arose out of the same contract and between the same parties, and as the court interpreted the contract in the former case, an estoppel by judgment arose which left no room for further construction. The court ruled that appellant was estopped to show that the District Court in the first case erred in deciding that the second patent application was a continuation of the first within the meaning of the agreement sued upon.

■ We think that the court's decision was in the main correct. As to all of the questions and facts directly put in issue and determined by the court as a ground of recovery in the first case, since that judgment remains unmodified, there was an estoppel. The same issues could not be redetermined in the second suit, but had to be taken as established. Southern Pacific R. Co. v. United States, 168 U.S. 1, 18 S.Ct. 18, 42 L.Ed. 355; United States v. California Bridge & Construction Co., 245 U.S. 337, 341, 38 S.Ct. 91, 62 L. Ed. 332; Tait, Collector, v. Western Maryland Ry. Co., 289 U.S. 620, 53 S.Ct. 706, 77 L.Ed. 1405; Warner v. Tennessee Products Corp., 57 F.(2d) 642 (C.C.A.6); D'Arcy v. Staples & Hanford Co., 161 F. 733, 738 (C.C.A.6).

The first case necessarily decided that the second patent application was a continuation of the first. The court could not otherwise have held that a recovery was due for the adjudicated manifolds, for only manifolds corresponding to patent No. 1,536,044 were there involved, and this patent issued upon the second application. Since this question has been judicially determined it will not be reopened, and all contentions based thereon are untenable. Thus appellant's defense based upon cause 6 of the contract, which suspends royalties for delay or failure to secure a patent, has no merit, as it is grounded upon the premise that the first patent did not issue upon the original application. Also in this connection no latent ambiguity exists in the license contract. The agreement expressly applies to continuation and divisional applications, and hence it covers manifolds manufactured under both patents.

Since no question judicially determined in the former suit may be reopened and since the first case decided that the adjudicated manifolds of round cross-section fell within the license contract, the court correctly charged the jury in the present case that the principal issue was whether the manifolds described in this petition were identical, or substantially identical, with the manifolds adjudicated in the former case. Warner v. Tennessee Products Corp., 57 F.(2d) 642 (C.C.A.6). Cf. Mills Novelty Co. v. Monarch Tool & Mfg. Co., 76 F.(2d) 653 (C.C.A.6).

Appellant concedès that the Buick 1926, 1927, and 1928 manifolds are identical with the adjudicated manifolds, and virtually concedes the Pontiac, 1928, and Oakland, 1928, to be substantially identical therewith. It admits that the correct recovery for these manifolds, as shown by the agreed figures, is $201,299.60. We are concerned, therefore, only with the manifolds not conceded to be identical, or substantially identical, with the adjudicated manifolds. As to these, the appellant claims that the court erred in the rejection of evidence relating to the prior art, and also erred in his charge to the jury.

The District Court refused to admit in evidence any prior art other than that considered in the former royalty case (Swan Carburetor Co. v. General Motors Corp., supra), upon the ground that the scope of the contract as limited by the prior art had been determined adversely to appellant's contention. It is conceded by appellant that as to manifolds identical with those adjudicated, it is estopped to claim that they are without the license contract. However, appellant contends that as to those manifolds which are claimed to be only substantially identical with the adjudicated manifolds, it is entitled to introduce further evidence limiting the scope of the patent claims and to seek a further decision. This contention is correct. Westinghouse Electric & Mfg. Co. v. Formica Insulation Co., 266 U.S. 342, 351, 45 S.Ct. 117, 120, 69 L.Ed. 316. The estoppel of the prior judgment extends only to the matters litigated, or which might have been litigated in the former case. Nolan v. City of Owensboro, 75 F.(2d) 375 (C.C.A.6). For the estoppel to be effective, the issues of law and fact must be the same. Triplett v. Lowell, 297 U.S. 638, 648, 56 S.Ct. 645, 650, 80 L.Ed. 949. Here the question is whether new and different manifolds come within the license contract, and therefore the issues of fact in the first royalty case are not identical with those here presented. The court erred in excluding evidence of the prior art. However, this was not prejudicial because the admission of this evidence could not reasonably have changed the result. The manifold excluded, upon which appellant relies most strongly, is Murray and Tregurtha. We do not consider decisive the fact that Murray and Tregurtha is adapted to a three-cylinder marine motor. A three-cylinder engine involves no problem of secondary distribution, while Swan may be used on any multiple cylinder engine. Assuming that it is more difficult to distribute to six cylinders than to three, the question still remains whether this exclusion was prejudicial. The device was before the District Court in the first royalty action on motion to reopen the case. Over thirty affidavits and over two hundred pages of exhibits dealing with the operation of this particular manifold were filed. The motion was denied upon the ground not only that reasonable diligence had not been shown, but also because this structure was merely cumulative. While that ruling does not bind this court, it is persuasive. Even though Murray and Tregurtha in form resembles Swan, it was no more successful in its operation than the manifolds admitted in evidence. The jury had before it the cream of the prior art, Matheson, Peerless, and Fay & Bowen. Appellant was given permission to introduce all of the examples of the prior art that were considered in the former royalty case, but failed in general to avail itself of the opportunity. The exclusion of other and less pertinent manifolds could not well have affected the decision. Obviously it is not the quantity but the pertinency, of prior art models which aids in deciding patent questions.

Appellant's second main contention in the law appeal is that the court erred in failing to charge the jury as to whether the infringing manifolds are essentially and substantially identical with the prior art, as exemplified by Matheson, Peerless, and Fay & Bowen. This point is more clearly explained by indicating what the court did charge. In substance it charged that if appellant's manifolds are identical, or essentially and substantially identical with the adjudicated manifolds, then appellee is entitled to recover royalties for them, but that appellee is not entitled to recover for such manifolds if they are identical with Matheson, Peerless, or Fay & Bowen. It failed, however, specifically to charge that if the manifolds are essentially and substantially identical with Matheson, Peerless, or Fay & Bowen, it was not entitled to recover. In other words, it is asserted that the court permitted a broader comparison of appellant's manifolds with those adjudicated, than with those of the prior art. Such comparison was, however, allowed when the court charged "the question which the jury must decide is when does and when does not a given manifold depart from Exhibits

9, 10 and 11 [the manifolds previously adjudicated] and reach Matheson, Peerless, Fay & Bowen, or some other type of manifold which is not within the scope of Swan's patent." Such question could only be answered by the jury upon comparison with both adjudicated and prior art manifolds, and the record presents substantial evidence that the manifolds for which recoveries are claimed are either identical, or are substantially identical, with the adjudicated manifolds.

As an additional defense appellant contends that it is not liable because payment of royalties is excused under clause 7 of the license agreement, which provides: "Should an unlicensed party at any time undertake the manufacture of manifolds substantially corresponding to those on which royalty is then being paid Licensor by Licensee, and should Licensor, upon being notified of such manufacture, neglect to institute suit for infringement of its patent right against such unlicensed party or production within ninety days after such notification, or neglect at any time to promptly and vigorously prosecute such suit, Licensee shall be under no further obligation to pay royalties on its said production" until such condition is remedied. Appellant claimed that manifolds were manufactured by unlicensed parties without appellee's instituting suit to protect its patent rights. It did not endeavor to prove that such manifolds substantially corresponded to appellant's manifolds. During the period in which appellant claims that the licensor neglected to institute or prosecute suit, royalty was not then being paid by appellant to appellee. Appellant cannot therefore rely upon this paragraph of the license agreement. The District Court, however, ruled against appellant's contention upon the ground that the words "upon being notified" were used in the contract in their ordinary, natural and primary sense, and that clause 7 did not become operative until appellant had in some way notified appellee to institute and prosecute such suits. Appellant contends that mere knowledge by the appellee brings this paragraph of the contract into force. At the trial appellee offered proof that appellant had never notified appellee to prosecute any infringers, and appellant stated that it intended to offer no such proof. The primary question, therefore, is whether the words "upon being notified" require mere knowledge, or require actual notification.

This defense was not pleaded nor urged in Swan Carburetor Co. v. General Motors Corp., supra, the first action for royalties, and hence the judgment of the court in that case does not bear upon this question. Warner v. Tennessee Products Corp., 57 F.(2d) 642 (C.C.A.6), and Goodman v. Simonds, 20 How. 343, 365, 15 L.Ed. 934, are not in point.

We think the District Court ruled correctly upon this point. The clause was drafted by appellant's counsel, was intended to benefit appellant only, and should be construed most strongly against it. Cf. Mount Vernon Refrigerating Co. v. Fred W. Wolf Co., 188 F. 164, 168 (C.C.A.6); Texas & Pacific Ry. Co. v. Reiss, 183 U. S. 621, 626, 22 S.Ct. 253, 46 L.Ed. 358. Actual notice to appellee by appellant must have been contemplated, for otherwise there would be no practical way in which appellant could compute the ninety-day period after which royalties would be suspended. The fact that the word "notify" is re-emphasized in the word "notification" also is significant. The word "notify," is not, as appellant would have us conclude, synonymous with "notice." "Notification" is "the act of notifying" (Webster's International Dictionary, 2d Ed., 1935), and by the reiteration of the word the parties indicated that they meant more than mere notice or knowledge. Cf. Haldane v. United States, 69 F. 819, at page 822 (C.C.A.8), where the court said: "The doctrine is well established that, when a statute requires notice to be given to a person for the purpose of creating a liability, personal notice is intended, unless some other form of notice is expressly authorized by the statute. * * * The same rule, we think, is applicable to notices required to be given by the terms of an express contract."

The judgment in the royalty case is affirmed.

### Infringement Case (No. 7102).

This appeal involves facts similar to those of the royalty case, but it arises out of a suit for injunction because of patent infringement. The usual defenses of invalidity and non-infringement are made in the answer.

While all claims of both patents are pleaded, the claims relied upon are method claims 4, 5, 8, 9 and 10, and apparatus claims 11, 12, 13, 20, 22 and 23, of patent No. 1,536,044, and claims 5, 7 and 8 of pat-

ent No. 1,636,721.[5] The special master found all claims in suit valid and infringed, and the District Court confirmed his report.

The first question is whether the apparatus claims are valid. It is not necessary that Swan understand all the scientific principles involved in his device. A. O. Smith Corp. v. Lincoln Electric Co., 82 F.(2d) 226 (C.C.A.6). It is only necessary that he make such disclosure and description of his invention that it may be put into practice. Diamond Rubber Co. of New York v. Consolidated Rubber Tire Co., 220 U.S. 428, 436, 31 S.Ct. 444, 55 L. Ed. 527. The fact that many leading automobile manufacturers immediately accepted the Swan manifold shows the existence of a pressing problem and its solution. Leading engineers testified that Swan had made a real contribution to the industry. If we were to consider the question of invention a close one, the wide commercial success of the device and its adoption after thorough tests by experts strengthens the presumption of validity. Motor Improvements, Inc., v. General Motors Corp. (C.C.A.) 49 F.(2d) 543.

Appellant contends that Swan accomplished nothing in the art, and attempted to show by Cox indicator and Fulwiler tests, moving pictures of the action in the manifolds, and the use of neon lights in glass-sided manifolds, that Swan's structure failed to secure the "equal distribution" which he claims. It is true that the Swan manifold falls short of scientifically equal distribution, but its wide acceptance in the automotive industry substantiates the testimony of the many witnesses who assert that it gives "good commercial distribu-

tion." The engineer for General Motors Corporation stated that Swan gave "vaporization practically complete." Equal vaporization is of course not synonymous with equal distribution; it is merely one of the indispensable means by which equal distribution is secured. The crux of the problem is to secure distribution of the fuel mixture to the various cylinders, equal not only in amount, but in exactly the proper constant proportions of air to fuel. The particles of gasoline tend to cling to, or "puddle" on the walls of the manifold, and thereby to prevent uniformity in the quality of the mixture as it reaches the various cylinders. Swan claimed, and this record supports him, that he first understood how this problem could be solved and that he first secured substantially complete vaporization. He did this mainly by the creation of a maximum turbulence at all points where the direction of the flow was changed. The result was that the vaporized fuel which tended in the manifold to revert to liquid was revaporized. Swan also secured equal distribution by directing the properly mixed fuel through pipes in which there was a complete absence of curves or pockets in the longitudinal line of travel in either header or branches.

Appellant urges that the patents in suit are anticipated. A great number of prior art manifolds was introduced in evidence, only the most pertinent of which we will consider. The Murray and Tregurtha manifold has heretofore been discussed in the royalty case. It did not perform according to the Swan principle, and its distribution was faulty. This is equally true of Matheson, Peerless and Fay & Bowen, which must rank as prior efforts

5 Claims 4 and 20 of patent No. 1,536,- 044 have been previously printed in the margin. Typical of the claims of Patent No. 1,636,721 is No. 5, which reads as follows:

"In a manifold for a six-cylinder internal combustion engine, the combination with a main manifold duct, level throughout its length, a straight or substantially straight riser duct connecting the carburetor with the central part of the main duct and being at right angles, or substantially at right angles thereto, the interior of the connection of the riser to the main duct being at a substantially uniformly sharp angle all around the connection, three secondary ducts each for connecting the main duct to two of the engine cylinders, the middle secondary duct being connected to the main duct at the junction of

the riser with the main duct and at right angles, or substantially right angles thereto, a distributing zone with a non-recessed roof being formed at the junction of the main duct, the riser and the middle secondary duct, the two other secondary ducts being connected to the main duct at the ends thereof, all of said secondary ducts being parallel, or substantially parallel to each other and perpendicular or substantially perpendicular to the main duct, on the interior the end secondary ducts making a right angle connection with the main duct at the sides nearest the middle and the middle secondary duct making a sharp connection with the interior of the main duct, and all of said ducts and riser being devoid of curves and recesses in the direction of flow of the fuel mixture."

and failures. Round header and round branches had long been used, but these article claims are for a combination, and are not invalidated by the fact that certain elements of the combination were old if there is invention in the combination. Goodyear Tire & Rubber Co. v. India Tire & Rubber Co., 51 F.(2d) 204, 205 (C.C.A. 6); International Visible Systems Corp. v. Remington Rand, Inc., 78 F.(2d) 606, 608 (C.C.A.6), Swan's inventive concept consisted in bringing the fuel mixture from the carburetor to header in substantially straight lines, and so abruptly changing its course in the header and at the branches as to create a maximum turbulence at the points where direction of flow changed with resulting re-mixture of the heavy particles of gasoline and air. This concept was new. With it Swan combined forms which, while old, produced a straight line in the longitudinal flow of fuel mixture. This combination was new. The turbulence and its creation within a structure which avoided the dangers of excessive puddling were his main contribution to the art. Extensive observations made through manifolds covered with glass showed that in the Swan form the turbulence was actually created. A materially better result was obtained, and this result is accomplished alike by the round and the square cross-sectional form.

Appellant contends that if the claims are valid they are limited to flat-bottomed or rectangular shaped header and branches. This precise question was adjudicated in the first General Motors Case [42 F.(2d) 452]. Though that decision may not be controlling here, nevertheless the reasoning is persuasive. While in patent No. 1,-536,044 Swan discloses an intake and branches with outlets preferably square in cross-section, he also states in the specification that round, hexagon, octagon, or other cross-sectional shapes may be used. It is true that claims 11, 12 and 13 of this patent describe "walls the intersections of which form straight lines," but the remaining claims are not thus restricted.

Whether or not patent No. 1,536,044 described a pioneer invention, as in effect held in the General Motors Case [42 F.(2d) 452], under the specifications, which are to

be read with the claims, though they may not expand or limit them, Swan is entitled to a range of equivalents broad enough to cover appellant's manifolds. Cf. Bishop & Babcock Mfg. Co. v. Fulton Co., 37 F. (2d) 293 (C.C.A.6). This is true even as to claims 11, 12 and 13, in which, as in the other claims, the gist of the inventive concept was the creation of the maximum turbulence as above described, not restricted to any particular form. Cf. United Shoe Machinery Corp. v. O'Donnell Rubber Products Co., 84 F.(2d) 383 (C.C.A.6).

It is not contended that any of the claims in suit fails to describe the manifold in such manner that one skilled in the art could build it. This does not mean, however, that all claims in suit are valid. Each claim of the patent may be considered as though setting forth a complete and independent invention. 1 Walker on Patents, § 220; Veneer Machinery Co. v. Grand Rapids Chair Co., 227 F. 419 (C. C.A.6); Altoona Publix Theatres, Inc., v. American Tri-Ergon Corp., 294 U.S. 477, 487, 55 S.Ct. 455, 459, 79 L.Ed. 1005. In patent No. 1,536,044, claims 11 and 12 add nothing that we here consider material to claim 13, and claims 22 and 23 nothing material to claim 20. We therefore find it unnecessary to pass upon their validity. Cf. Hillborn v. Hale & Kilburn Mfg. Co., 69 F. 958, 961 (C.C.A.3).

As to patent No. 1,636,721, the claims in suit are similar except that claim 5 provides for a flat roof at the junction of riser and header, while claims 7 and 8 describe a recessed roof at that point. Claim 8 is not considered. We hold claims 13 and 20 of the first patent, and claims 5 and 7 of the second patent valid. The invention therein disclosed satisfied a want long recognized in the art and produced a new result.[6]

The manifolds alleged to infringe are those made by the Nash Company, and sold by appellant in the year 1926. These were of round construction, and as stipulated in the agreed statement of facts, were substantially identical with those adjudicated in the first General Motors Case, and gave similar performance. If so, they secure the same, or substantially the same

[6] See article On Manifolds and Distribution. How the Manifold Action is Limited By and Must Coordinate With the Carburetion. Why it is that all the Cylinders of an Engine Are Not Served Equally. Motor for April, 1911.

Also article On Manifolds and Distribution. Some Further Considerations of the Design of Intake Systems as They Affect the Equality of Distribution of the "Mixture" to the Engine Cylinders. Motor for May, 1911.

888

results as those of Swan. In view of the nature of the invention and these conceded facts, we deem it unnecessary to enter into a detailed description and discussion of appellant's various manifolds. An expert witness for appellant testified that it was immaterial whether the manifolds were round or square in cross-section. They infringed the valid claims of the patents in suit.

Appellant contends that the method claims of patent No. 1,536,044 are invalid because they describe merely the function of the manifold. Since as to infringement one royalty is appropriate compensation for breach of appellee's monopoly no matter upon how many bases that monopoly rests, Reo Motor Car Co. v. Gear Grinding Machine Co., 42 F.(2d) 965 (C.C.A.6); Firestone Tire & Rubber Co. v. United States Rubber Co., 79 F.(2d) 948 (C.C.A. 6), we find it unnecessary to pass upon their validity or the question of their infringement.

Decree affirmed as to claims 13 and 20 of patent No. 1,536,044, and claims 5 and 7 of patent No. 1,636,721. The bill is dismissed as to all other claims, without prejudice.