## SWAN CARBURETOR CO. v. CHRYSLER CORPORATION.

### No. 6593.

District Court, E. D. Michigan.

July 8, 1940.

Richey & Watts, of Cleveland, Ohio, and Swan, Frye & Hardesty, of Detroit, Mich., for plaintiff.

Merrell E. Clark, of New York City, J. King Harness, of Detroit, Mich., and Charles H. Walker, of New York City, for defendant.

LEDERLE, District Judge.

1. Plaintiff is the owner of Swan patents in suit, Nos. 1636721, which will be hereafter called the 721 patent, and 1536044, which will hereafter be called the 044 patent. The application for the 721 patent was filed on September 17, 1921, and for the 044 patent was filed on November 5, 1924. The application for the latter patent stated that so far as the matters common to the two cases was concerned, that application was a continuation of the application for the 721 patent. At a preliminary hearing I found that the defendant was in privity with the defendant in the case of Reeke-Nash Motors Company v. Swan Carburetor Company, 6 Cir., 88 F.2d 876, 887, and that it was bound by the decision in that case. Specifically I determined that the defendant was estopped to deny:

A. The validity of claims 13 and 20 of the 044 patent, and claims 5 and 7 of the 721 patent;

B. That the manifolds illustrated in Exhibits 40 to 46, inclusive, involved the Swan invention and come within claims 13 and 20 of the 044 patent and claims 5 and 7 of the 721 patent, and that the title to the two patents in suit is in the plaintiff.

2. The claims asserted in this suit by the plaintiff are 5 and 7 of the 721 patent, and method claims 4, 5, 8, 9 and 10, and structure claims 13, 22 and 23 of the 044 patent.

3. Of the claims above enumerated, only claims 5 and 7 of the 721 patent and claim 13 of the 044 patent were passed upon by the Circuit Court of Appeals, in its decision in Reeke-Nash Motors Company v. Swan Carburetor Company, supra, and likewise these are the only claims adjudicated in the District Court's final decree on mandate in that case. Claim 20 of the 044 patent was originally in this case, but was later withdrawn by the plaintiff.

4. The patents in suit have been the subject of much litigation, and opinions heretofore filed have been found to be very helpful in determining the scope of the invention and the construction not only of the claims that were involved in those cases, but of all of the claims involved in this suit. The decision of the Circuit Court of Appeals in the Reeke-Nash case is binding upon this Court, and full weight should be given to all of the other decisions based upon the rule of comity. The plaintiff should be given the full benefit of the invention set forth in the patents and should not be required to re-litigate the matters settled in the Reeke-Nash suit. On the other hand, the burden of proof of infringement rests upon the plaintiff, and the defendant is entitled to a decision based upon the record in the case at bar.

The decision of the Circuit Court of Appeals in the Reeke-Nash case not only established the validity of the claims therein involved, but also limited their scope. In the Reeke-Nash case, the Circuit Court found that "Swan's inventive concept consisted in bringing the fuel mixture from the carburetor to header in substantially straight lines, and so abruptly changing its course in the header and at the branches as to create a maximum turbulence at the points where the direction of flow changed with resulting re-mixture of the heavy particles of gasoline and air. This concept was new. With it Swan combined forms which, while old, produced a straight line in longitudinal flow of fuel mixture. This combination was new. The turbulence and its creation within a structure which avoided the dangers of excessive puddling were his main contribution to the art."

5. At the time that Swan made his invention the automobile industry was confronted with a problem that was not present in the early days of the automobile business. In the beginning when the demand for gasoline was relatively limited, commercial gasoline was of relatively high volatility, so that in normal operation it was sufficiently vaporized in passing through the carburetor and intake manifold, that there was very little liquid gasoline left in the mixture, and in this condition came to be called a dry mixture. It is comparatively easy to distribute uniformly to the several cylinders of an internal combustion engine a dry mixture, and the manifolding problem is not difficult to solve.

Just prior to 1919 the demand for gasoline had greatly increased, and the producers started to market a product containing larger amounts of less volatile hydro-carbons. The result was that under normal conditions the gasoline was not nearly so completely vaporized in passing through the carburetor and manifold, so that a large proportion of the gasoline in the mixture delivered to the engine was in a liquid form. This mixture came to be known as a wet mixture.

By 1919 the problem of using this less volatile fuel became acute and automotive engineers undertook to solve it. As pointed out by the Circuit Court of Appeals in the Reeke-Nash case, Swan undertook to get a satisfactory distribution by designing a manifold that would keep the liquid particles uniformly distributed throughout the mixture so that each cylinder would receive relatively the same amount of liquid and gas as every other cylinder. "He did this mainly by the creation of a maximum turbulence at all points where the direction of flow was changed. The result was that the vaporized fuel which tended in the manifold to revert to liquid was revaporized. Swan also secured equal distribution by directing the properly mixed fuel through pipes in which there was a complete absence of curves or pockets in the longitudinal line of travel in either header or branches." Reeke-Nash Motors Company v. Swan Carburetor Co., supra.

Other engineers attempted to solve the problem by applying sufficient heat to the manifold in an appropriate manner to vaporize the liquid gasoline in the mixture and thus convert the mixture from a wet mixture to a dry mixture. When this is done the problems presented by the wet mixture disappear and manifolding becomes as simple as it was in the early days of the art.

6. The manifolds charged to infringe in this suit are the defendant's down-draft Dodge-Plymouth, Defendant's Exhibit 70 and Defendant's Exhibit 71, and the up-draft Dodge, Defendant's Exhibit 69. All of the manifolds involved in this case, including the prior art manifolds relied upon by the defendant, the manifolds of the patent in suit and the defendant's accused manifolds are of the so-called "T" type, in which the air-gasoline mixture passes from the carburetor through a vertical inlet pipe (called a riser in an up-draft man-

ifold), to the center of a horizontal header. From this header, three branches, one in the center and one at each end, lead to the engine cylinders. In the case of a six-cylinder engine, each of these branches serves two cylinders. All of the prior art manifolds relied upon by the defendant have passages of round cross-sectional form and the two primarily relied upon (Matheson and Fiat) have rounded bends at the turns from the header to the end of the branches. The manifolds accused in this suit are also of a round cross-sectional form.

7. In the Swan patents, it is made clear that in accordance with the patented invention the desired uniformity of distribution is obtained not by vaporizing the fuel through the action of heat, but by the effect upon a cold or wet mixture of the particular manifolding configurations described in the patent. Swan recognized as old in the prior art manifold structures as described by him on page 2, lines 43 to 67 of the 721 patent, as follows:

"The intake manifold as customarily provided, presents a main up-take leading through a horizontal disposed supply pipe curving into lateral branches in turn coupled to the engine casing and registering with the intake openings of the various cylinders. The construction of the supply pipe and branches forms an interior, oftentimes irregular, at times presenting shoulders, depressions, or pockets, and most usually with curved walls leading to the various branches, the branches occupying planes disaligned with the plane of the main supply pipe. In these formations, it has been discovered that the liquid or gasoline will cling to the walls of the manifold tending to feed in a direction contrary to the direction of supply to the cylinders, accumulating in places, and tending to follow a straight line flow. This leads to accumulations, even if only temporary, at points within the manifold and tending to relatively enrich a part of the mixture leading to some of the cylinders, while correspondingly impoverishing the mixture leading to other cylinders."

8. Defendant's down-draft Dodge-Plymouth and DeSoto manifolds are such manifolds as are described in the passage quoted above, their horizontally disposed supply pipes (headers) curving into the end branches, the interiors presenting depressions, pockets and curved walls leading to the branches, and the branches occupying planes disaligned with the plane of the main supply pipe (defendant's headers run uphill, the end branches downhill, and the center branches both up and down). Each branch of defendant's manifolds leads to a valve pocket within the cylinder block and from this pocket the mixture must pass upwardly through the valve ports. These, together with the depressed central portion of defendant's manifolds, constitute definite depressions or pockets within the manifold. And, in a sense, the entire body of defendant's manifolds, from the down-draft inlet pipe to the valve ports at the top of the valve pockets, constitute one big pocket. The Dodge up-draft manifold falls in the same category, except that the floor of the manifold per se is level. The Dodge up-draft manifold is used with the same valve pockets as the other manifolds of defendant.

9. As contrasted with the Swan manifold, which does not depend upon the vaporization of liquid fuel by heat, but, on the contrary, is specifically concerned with the distribution of "cold", or "wet" mixtures, defendant's manifolds are dependent upon the vaporization by heat for satisfactory operation, particularly in view of the several pockets within defendant's manifolds in which liquid fuel would otherwise tend to accumulate. Heat for vaporizing fuel is applied to defendant's manifolds primarily by a "hot spot" exhaust-heated jacket surrounding the central junction. This "hot spot" is so located that the incoming fuel that is in liquid form will come in contact with its heated surface and will be vaporized by it. The balance of the manifold is maintained above the dew point by radiation from the closely adjacent exhaust manifold and by the heat of the cylinder block, so that fuel which has once been vaporized is not condensed on the manifold walls. This "hot spot" is of the same character as that disclosed in Fig. 2 of the Journal of the Society of Automotive Engineers, of July, 1920, page 26, and performs the function described for that "hot spot" in that publication (Defendant's Exhibit 96, Tab 1).

10. Observations made by defendant's expert during plaintiff's inter partes road tests of defendant's car showed that the heating means employed by defendant in connection with its manifolds are, in fact, effective to produce and maintain, even under the extreme conditions of hill climbing with wide open throttle, a substantially

dry mixture, or in other words, a mixture having such a small proportion of its gasoline content in liquid form as to be negligible so far as any problem of distribution is concerned. Under normal operating conditions with partly closed throttle, the mixture appears to be completely dry. At all times it has, as defendant's expert testified, "the characteristics of a dry mixture" and is "distributed in the same manner in a manifold, independent of the shape of the manifold."

11. The Matheson manifold was in public use on 6-cylinder automobiles in the United States more than two years prior to the earliest Swan application.

12. The Fiat manifold was in public use in the United States more than two years prior to the filing of Swan's earliest application.

13. The Murray & Tregurtha manifold was in public use on 3-cylinder marine engines in the United States more than two years prior to the earliest Swan application.

14. Considering the teachings of the patent in suit in relation to the prior art, I am forced to conclude that instead of following the Swan teachings in the construction of its manifolds, the defendant proceeded in the opposite direction, and defendant's manifolds depart from the teachings of the Swan patents more than the prior art does.

Like the prior art Matheson and Fiat manifolds, defendant's down-draft Dodge-Plymouth manifold has easy bends from the header to the end branches. In terms of R/d (the ratio of the mean radius of the turn to the diameter of the passage— the engineering expression for the sharpness of a bend), the bends in the defendant's manifold (R/d 1.20) are more sweeping than those of Fiat (R/d 1.02) and much more sweeping than those of Matheson (R/d 0.80).

Even in terms of absolute dimensions (not a correct comparison from an engineering point of view), the end bends of this manifold of the defendant's (inner radius of end bends $\frac{7}{8}''$) are substantially identical with those of Fiat ($\frac{29}{32}''$) and much more sweeping than those of Matheson ($\frac{9}{16}''$).

The riser of the Fiat manifold makes a substantially sharp intersection with the header and center branch. In defendant's Dodge up-draft manifold, this intersection is not sharp.

In view of the foregoing, and of the pockets and depressions in defendant's down-draft manifolds, not present in the prior art Matheson and Fiat manifolds, defendant's manifolds are further removed from Swan than are these prior art manifolds.

15. Plaintiff's inter partes road tests (including acceleration, hill climbing and fuel economy tests), conducted under defendant's regular heated conditions (produced by the "hot spot", etc), showed that under those heated conditions substantially identical results, in terms of engine performance, were achieved with defendant's Dodge-Plymouth standard manifold as with a comparably sized manifold of Swan's preferred configuration.

16. a. (1) Defendant constructed for comparative tests, a manifold of the Matheson design but of a proportionately smaller size to fit the smaller engine upon which the standard Dodge-Plymouth manifold is regularly used. The passages in the riser, header and branches of this reduced Matheson manifold were made of the same size as in the corresponding part of defendant's manifold, and the cross-sectional area of the header of this reduced Matheson manifold bears substantially the same relationship to the displacement of the defendant's engine as the area of the header of the original Matheson manifold bears to the displacement of the Matheson engine, so that the mixture velocity in the two manifolds is substantially the same for the same engine speeds. And all radii of curvature were reduced, in accordance with established engineering principles, in the same proportion as the diameters of the adjacent passages had been reduced, so as to maintain the same effect upon the mixture passing through as in the full size original. In engineering parlance, the R/d of the bends (the ratio of the mean radius of the bends to the diameter of the passage) was maintained constant. This reduced Matheson manifold is the full mechanical and functional equivalent of the original Matheson manifold. This is a manifold which the Matheson Company, if it were still in business, or any other member of the public, is free to use on present day engines, with or without a "hot spot" such as defendant

regularly uses, following the prior art disclosure.

(2) This reduced Matheson manifold was tested by defendant on one of defendant's cars in inter partes road tests (including acceleration, hill climbing and fuel economy tests, and paralleling plaintiff's road tests), in comparison with the standard Dodge-Plymouth down-draft manifold (Deft's Exhibit 100; like the split model, Deft's Exhibit 70). In all of these tests, the manifolds were subjected to defendant's regular heated conditions. These tests showed that under those heated conditions, substantially identical results, in terms of engine performance, were achieved with the reduced Matheson manifold as with the defendant's standard manifold.

b. Inter partes dynamometer tests (for power and fuel consumption at various speeds, acceleration, and flexibility) were conducted by defendant upon an original Matheson engine, using successively for comparative purposes (1) a reproduction of the original Matheson manifold, and (2) a comparably sized manifold of Swan's preferred square-sectioned, square-cornered configuration. "Hot spot" heated conditions, similar to those obtaining in defendant's cars, were maintained throughout these tests. The results of these tests, in terms of engine performance, were the same, for the Matheson and Swan manifolds.

17. a. (1) Defendant constructed for comparative test a manifold of the Fiat design, but of a proportionately smaller size to fit the defendant's smaller engine. The same engineering principles referred to in describing the construction of the reduced Matheson manifold, were again employed, so that this reduced Fiat manifold is the mechanical and functional equivalent of the original Fiat manifold. This is a manifold which the Fiat Company, or any other member of the public, is free to use on present day engines, with or without a "hot spot."

(2) This reduced Fiat manifold was tested in comparison with the defendant's standard Dodge-Plymouth manifold in the same inter partes road tests that were conducted by defendant as described above in connection with the reduced Matheson manifold, and under those heated conditions, it too gave results substantially iden-

tically, in terms of engine performance, as those obtained with defendant's standard manifold.

b. Inter partes dynamometer tests (for power and fuel consumption at various speeds, acceleration and flexibility) were conducted by defendant upon an original Fiat engine, using successively for comparative purposes (1) a reproduction of the original Fiat manifold, and (2) a comparably sized manifold of Swan's preferred square-sectioned, square-cornered configuration. "Hot spot" heated conditions, similar to those obtaining in defendant's cars, were maintained throughout these tests. The results of these tests, in terms of engine performance, were the same for the Fiat and Swan manifolds.

18. When operated under the same conditions as those under which defendant operates its accused manifolds, I find that Swan, Matheson and Fiat manifolds all produce substantially the same results measured in terms of engine performance as do the accused manifolds. I find that the Swan invention is not embodied or practiced in defendant's manifolds, and that such degree of uniformity of distribution as is obtained by the use of defendant's accused manifolds is due to the application, to the manifold, of heat in an appropriate manner and in sufficient amount to vaporize so much of the fuel in the mixture that the problem to which the Swan patents are directed—the uniform distribution of "cold" or "wet" mixtures—is not presented. By vaporizing the mixture to substantial dryness by heat, defendant avoids the "wet mixture problem" which Swan sought to solve, and distributes satisfactorily the resulting substantially dry mixture without using any "improvement" that Swan may have made over the prior art.

It is only in the lower portion of the normal range of engine speeds that any manifolding problem is presented even with "wet" mixtures. Defendant's manifolds, without the use of heat as defendant uses it, do not give satisfactory results at those lower speeds. The satisfactory results achieved by defendant at those speeds through the use of heat, are achieved at a sacrifice of about 10% in power at the higher speeds, through the impairment of what is commonly called volumetric efficiency. Vaporization by heat for aiding distribution, is especially inveighed against

by Swan because of the impairment in volumetric efficiency which it entails.

19. I construe the comments of the Court of Appeals in the Reeke-Nash case, with regard to the Matheson manifold as meaning that while that manifold was a "failure" so far as concerned the uniform distribution of "wet" mixtures (88 F.2d 886, 887), it proved satisfactory for distributing the mixtures with which it dealt in 1910 and thereabouts, and which were substantially dry even in the absence of added heat because the gasoline then available was highly volatile compared with present day gasoline. 88 F.2d 879. This is consistent with the Court's statement (page 879 of 88 F.2d) that the old type of manifold "operated relatively satisfactorily" with the old volatile gasoline, and is confirmed by the testimony in this case that in 1910 and thereabouts the Matheson car operated in a highly satisfactory manner. This is further confirmed by the inter partes tests made of Matheson manifolds in this case, in which "hot spot" vaporization was employed, and in which the resulting substantially dry mixtures (like the mixtures of 1910) were distributed as satisfactorily as by comparably sized Swan manifolds or by defendant's manifolds under like conditions. The similar tests of Fiat manifolds which are described in the record in this case, confirm the fact that the Fiat manifold is equally capable of distributing substantially dry mixtures under like conditions.

20. In addition to the entire absence of the Swan patented invention, defendant's manifolds lack the following specific limitations of the structural claims in suit:

(a) a main manifold duct (header) level throughout its length; (b) end secondary ducts (end branches) making a right angle connection with the main duct (header) on the interior at the sides nearest the middle; (c) ducts devoid of curves and recesses in the direction of flow of the fuel mixture; (d) a distributing chamber formed of walls, the intersections of which form straight lines; (e) a wall of the chamber opposite the intake symmetrically formed and situated with reference to the outlets; (f) outlet branches angularly formed.

21. None of the claims in suit is infringed by any of the defendant's manifolds.

Conclusions of Law

 1. Plaintiff has not established that any of the defendant's manifolds here complained of infringes any claim of either of the Swan patents in suit.

2. A judgment may be entered dismissing the complaint, with costs to defendant.