## SWAN CARBURETOR CO. v. GENERAL MOTORS CORPORATION.

No. 14169.

District Court, N. D. Ohio, E. D.
Sept. 28, 1927.

F. O. Richey, of Cleveland, Ohio, Joseph H. Milans, of Washington, D. C., and Henderson, Quail, Siddall & Morgan, of Cleveland, Ohio, for plaintiff.

Frederick P. Fish and J. L. Stackpole, both of Boston, Mass., and White, Cannon & Spieth, of Cleveland, Ohio, for defendant.

WESTENHAVER, District Judge.

This action is brought to recover royalties alleged to be due under a license agreement. A jury trial was waived in writing, and the case tried to the court. The testimony, oral and documentary, is voluminous. The considerations urged in argument are too numerous to be discussed in detail, but I believe that none has been overlooked. In this memorandum, however, I shall deal briefly with such points only as I deem controlling.

The article involved is a manifold for internal combustion engines The main controversy turns on whether defendant's manifold

is within the terms of the license. The agreement is dated June 6, 1923. At that time, John W. Swan, assignor of plaintiff, had an application pending in the Patent Office on his alleged invention, filed September 17, 1921. No patent was ever issued upon this application. A continuation application was filed November 5, 1924, to meet certain difficulties found in the Patent Office, and patent 1,536,044 was issued thereon April 28, 1925. It recites that it is a continuation of the original application. The controlling questions, as I see them are: (1) Whether upon a proper construction of the license agreement defendant bound itself, as it now contends, to pay royalties only upon the specific, or, as plaintiff contends, the preferred, construction disclosed in the original application, or is bound to pay upon the manifold construction as covered by any claims, properly construed and limited, of the patent later issued; (2) if the foregoing question is answered adversely to the defendant, whether its present manifold is within said claims so construed and limited; (3) if defendant's manifold is within those claims, whether plaintiff may recover royalties on manifolds made and sold in an interval of eighteen months ensuing after the license agreement was made and before the patent was issued, it being asserted by defendant that this agreement exempts it wholly during that period, and by plaintiff that payment only is suspended until the patent issues. These several propositions will be briefly considered in the order stated.

■ 1. In my opinion, defendant's contention is not sound that it bound itself to pay royalties only on the specific construction disclosed in Swan's application pending when the license agreement was made. Defendant's argument is rested primarily on the words "specifically disclosed" found in the first "whereas" recital. These words are not controlling in determining the intent of the contracting parties. The agreement, I think, is intended to cover and include Swan's true invention, whatever it was. The words "specifically disclosed" are intended, I think, to refer to that application as the place wherein description of his invention might be found rather than to limit the agreement to pay on the specific form thereby disclosed.

This conclusion is made evident by an examination of all the provisions of the agreement. The granting or license clause is general and all-inclusive in its scope. It grants a license to make, use, and sell Swan's improvements in manifolds throughout the United States and territories and in all foreign countries in which letters patent therefor may be granted, concluding: "Under or corresponding to the aforesaid application of John W. Swan for United States Letters Patent and any and all Letters Patent that may issue on said application or any division or continuation thereof." This plainly looks to the future, and included the right to make, use, and sell, not merely the form specifically disclosed, but any form covered by any patent that might be issued on the original or any divisional or continuation application. Furthermore, in paragraph 4, the licensee agrees that it will not contest or question "the invention forming the subject matter of John W. Swan's aforesaid application for United States Letters Patent on manifold, or contest or question the validity of any patent or patents which issue thereon or correspond thereto." In paragraph 6 the license stipulates for exemption from payment of royalty in certain contingencies "until such time as Letters Patent of the United States shall issue covering such products." The licensee is also permittted to cancel "without prejudice with respect to the nature or scope of any patent rights on the part of the licensor." The licensee is also further exempt from its obligation to pay royalties if any other manufacturer makes manifolds substantially corresponding to these on which royalty is being paid, unless the licensor, upon notice, shall prosecute promptly and vigorously infringement suits. In paragraph 10 it is agreed that, if any patent referred to therein shall be held invalid or substantially limited, the license may be canceled by the licensee. In paragraph 11 the licensor agrees to communicate all improvements on manifolds of which it may become possessed, and that the licensee may use the same without the payment of further royalty. Taken as a whole, these provisions do not admit of any other construction than the one announced.

The parties, in making this contract, were undoubtedly represented by experienced counsel. Whether a patent would issue, and, if so, what would be the form and scope of its claims, was not then definitely known. They know, as everybody knows, that the issued patent might contain some claims limited to the specific form of manifold, and that it might contain other claims covering any new element invented by Swan and usable in combination with various old elements. It was recognized that a pending application might have to be divided to meet the requirements of the Patent Office, or that it might be expedient, to avoid difficulties in prosecuting the original application, to file another

as a continuation. As the event proved, Swan experienced such difficulty in procuring a patent upon his application pending when the contract was made, but no difficulty in procuring a patent upon another application filed as a continuation, but quite as broad, if not broader, in its scope and claims as those sought in the original. The contracting parties contemplated these contingencies and used apt language to confer on the licensee rights to make, use and vend as broad as might be obtained.

What the license agreement covers is Swan's invention as disclosed in his pending application. It was not limited to his preferred embodiment of his invention or to any specific form. The preferred or specific form as disclosed may be what induced defendant to take a license, but defendant contracted for a right to make, use, and sell any and all forms of Swan's invention, no matter whether obtained on the pending application or on any division or continuation of it. It also asked and obtained the right to make, use, and vend any improvements in manifolds made or possessed by Swan without the payment of any additional royalty. Having obtained these comprehensive rights, it is obliged to pay the agreed royalty. It is quite plain that defendant, so long as the license agreement remains uncanceled, is therefore bound to pay upon all manifolds which are covered by any of the claims, properly construed and limited, of the Swan patent eventually issued, and not merely upon some specific or preferred form disclosed in the original application.

2. Defendant is not estopped to show the actual invention disclosed by Swan's original application or by the patent actually issued. It reserved the right to cancel, but it has expressly and intentionally refrained from cancelling. Defendant, after making and using Swan's preferred form of manifold, later developed another form which it now claims is outside of Swan's patent, and then gave notice to the plaintiff that it would not pay royalties upon this form, but in said notice expressly declared that the license agreement was not thereby to be regarded as canceled. Defendant also agreed that it would not question the invention forming the subject-matter of Swan's original application or contest or question the validity of any patent or patents which might issue thereon or correspond thereto, and this stipulation applies equally to any patent or patents which in fact issued on any divisional or continuation application. Defendant was free to cancel or renounce and contest validity, but,

not having done so, defendant may now introduce and rely on the prior art only for the purpose of disclosing the true nature of Swan's invention and the proper construction and limitations, if any, to be placed upon the claims of the issued patent. If defendant may not show invalidity to escape payment of royalties, a practical difficulty exists when one comes to apply the rule permitting the claims to be limited to avoid the prior art. If that art shows the claims to be invalid, the licensee is estopped from denying validity and must pay royalties. If that art only shows that the claims may be still upheld as valid if narrowly limited, then the licensee is not so estopped, and does not have to pay. However, the rule of law as stated seems to be well established. As was said by Chief Justice Taft, in Westinghouse Co. v. Formica Co., 266 U. S. 342, 351, 45 S. Ct. 117, 120, 69 L. Ed. 316, "The distinction may be a nice one but seems to be workable."

In this case counsel agree on the law. Defendant admits that it is estopped to show invalidity. Plaintiff concedes that it may exhibit the prior art for the purpose of showing what Swan's invention actually was and in order that the claims may be properly construed and limited. The case will be disposed of in accordance with this understanding of the law. In view, however, of defendant's right to cancel, and its action in expressly refraining from so doing, it would seem that the patent claims ought not to be scrutinized with extreme care in order to find a way to save defendant from complying with its promise. Defendant knows better than any one else the value to it of keeping the license agreement in force. Hence the most liberal view should be adopted as to the scope of patent claims permissible under the prior art.

Defendant's contention, briefly stated, is that Swan's original application, as well as the issued patent, shows his invention to be a manifold of a certain type or form, and that all claims of the issued patent must be so construed and limited as to cover only that form. For the purposes of this opinion, an engine manifold may be said to consist of three distinct features: (1) A pipe, called a riser, leading vertically from the carburetor; (2) a horizontal pipe, called a header, above said riser; and (3) branches, three in number for a six-cylinder engine, leading from the header, one at each end and one in the middle to the cylinder ports and intake valves of the engine. The preferred form, as plaintiff contends, of Swan's manifold, or the specific and only form of his invention,

as defendant contends, is made with all three of those elements substantially square or rectangular in cross-section. Defendant further insists that these elements, if not square or rectangular in cross-section, must, in any event, include a flat dome or roof in the header above its intersection with the riser, and a flat or level floor for the header and branches. Undoubtedly this embodiment of Swan's invention was much stressed in the specification of his original, as well as of his continuation, application. In the arguments made by his solicitor in the Patent Office in support of the original application, this form of cross-section, particularly the flat floor, is specially stressed. It was this form which defendant first adopted and made, used, and sold. It has now substituted a manifold with header and branches round in form. It is this change in the form of cross-section, and particularly the elimination of the flat roof at the intersection of the header and riser and of the flat or level floor in the header and branches, which is chiefly relied on to differentiate defendant's structure from Swan's invention and to take it from out the scope of Swan's patent claims. It is also contended that the prior art imposes equivalent limitations, and that the claims in issue may be so construed as to be thus limited.

Upon mature consideration, I am of opinion that neither Swan's invention as disclosed in his original application, nor the claims of his patent as issued, were or are so limited. The prior art of internal combustion engine manifolds will appear from an article by P. S. Tice in the Motor of May, 1911. Accompanying the article are numerous illustrations showing existing forms of manifolds. The article also states the problems involved in properly vaporizing the gasoline and distributing the gas uniformly and without loss of efficiency to the different cylinders of the engine. The author of this article is the same Tice who first described and disclosed the vacuum feed system on the basis of which disclosure Jay's patent was afterwards held to be anticipated in the main and sustainable only for structural details. See Sparks-Withington v. Jay et al. (6 C. C. A.) 270 F. 449. Hence his description of the existing art in manifolds and of the problems involved may be accepted as correct. Swan sought to solve the problems so stated and discussed. He did so, in my opinion, by introducing a new and original principle of operation. The gist of his invention consists in bringing the gaseous mixture from the carburetor to the header in perpendicular or straight lines, then abruptly changing its course at right angles in the header, and then again changing its course at right angles from the header into the branches. All other features of Swan are subsidiary. The dome or flat wall at the intersection of the riser and header, the recesses in the outer bend at the intersection of header and branches, the flat or level floor, and even a square or rectangular cross-section, while stressed, are not made by Swan the substance of his invention.

The gaseous mixture, incompletely vaporized, moves at hurricane speed from the carburetor to the engine cylinder. The difficulty in distribution is due to imperfect vaporization. The mixture ought to be completely vaporized by the time it reaches the cylinder ports. At certain times, particularly in starting, or under certain conditions of load and speed, the mixture is completely vaporized with great difficulty. It may, and usually does, contain drops or particles of gasoline wholly unvaporized. This condition is called a rich or a wet mixture. It is said that present-day gasoline is much more difficult to vaporize than the gasoline made and sold in Tice's day. The tendency is for the gaseous mixture to follow the lines of least resistance and go by the shortest route from the carburetor to the cylinder. If its line of travel is curved, the unvaporized mixture will follow the curve and not be thrown out toward or beyond the center of the line of travel. In a manifold which has recesses, hollows, or other obstructions in the line of travel, the tendency will be for the wet or over-rich mixture to collect or to deposit at such places rather than to be thrown into the main current where air is plentiful and where it would be better, if not completely, vaporized. It is Swan's contention that all prior art and prior uses in manifolds showed these defects and lend themselves to these tendencies. His fundamental conception is and was that by changing abruptly at right angles the line of travel of the mixture, and by eliminating all obstructions, curves, or recesses in that line of travel, the tendency of the wet particles to collect at one place more than another would be avoided, and that, whenever the line of travel was thus abruptly changed at right angles, the wet particles would be thrown toward or beyond the main current and be mixed with the air and fully vaporized. In this way he asserts that an area of agitation or turbulence or mixing zone is created at each intersection where a sharp right-angled turn is made, and thereby the mixture is completely vaporized before it reaches the engine ports, and that no branch or port is more favored in the distribution than anoth-

er. Upon the record before me, I cannot say that this conception is unsound or that his invention does not function on these principles or realize these results.

Swan's original application clearly discloses what I have stated to be the gist and substance of his invention. Admittedly, he strongly stresses the square or rectangular form, and especially the flat floor, as the best embodiment of his invention, but he does not exclude other forms, including a riser, header, and branches, round in cross-section. In his original application, after stating his preference for the square form, he says the branches may be round, "the main idea being to have the bottoms of said branches level throughout their length and on the same level as the bottom of the main distributing chamber and of the same shape in cross section and equal in area." This conception of branches and header of the same shape and area, with the bottoms on the same level, is represented and covered in many of the claims. The conception of right-angled bends is likewise emphasized in the specifications and covered by many of the claims. In the continuation application, the equivalency of the round with the square cross section is even more clearly brought out and emphasized. In Fig. 9 of the issued patent is disclosed a round header and branch as an optional form. In the specifications, pages 4, 11, 6–24, Swan points out that, while it is preferable to make the manifold, including the intake, distributing chamber, branches, and outlets, angular in cross-section, he also points out that round, hexagon, octagon, or other cross-sectional shapes may also be used. He further notes that, while the outer angle of the branches leading to the cylinder may be curved or rounded, the inside angle of the turn must be sharp. He says: "Good results may be obtained in a modification of this character, in view of the fact that the wet constituents of the fuel will be caused to be projected beyond the sharp inside angle into the air at the turn, effecting a remixing of the constituents incident to the changed direction thus caused at the turn." It is these fundamental principles which Swan conceived and sought to apply to the mixture in its passage from the carburetor to the cylinder.

Such being the substance of Swan's invention, no good reason is perceived why, on the doctrine of equivalents alone, he would not, in the absence of limiting language in the patent claims, voluntarily imposed or accepted, be entitled to octagon, hexagon, or round forms. Certainly, in the absence of such limitations, he may have these optional forms which he has thus pointed out as equivalents. It may be that a flat floor would realize more perfectly his conception. It may be that a flat dome or roof at the intersection of the header with the riser, or recesses at the intersection of the header and branches in the outer corner, were considered preferable. But Swan did not include in his claims, nor in his specifications, these details as indispensable elements of his invention. In the round form, as in the square, we have a floor without curves, recesses, or obstructions in the line of travel. In the round form the mixture travels in straight, if not in rectilinear, lines, except when its direction is changed, and, whenever it is so changed, that change of direction is at an abrupt right angle. In the round, as in the square form, the heavier or wet particles are thrown violently toward or beyond the center of the line of travel. Thus there is created a zone or area at the intersection of the riser and header, as well as at the intersection of the header and branches, in which there is that agitation or turbulence which is insisted upon by Swan as the best means of thoroughly vaporizing the mixture and delivering the same equally to each cylinder without favoring one over another.

The several claims of the issued patent do not call for extended discussion. Nothing is found in the prior art which requires the imposition of limitations upon these claims so as to exclude the round form. Of that prior art, whether found in patents, publications, or prior uses, the most pertinent, it seems to me, are Matheson and Peerless. On this hearing, much testimony was introduced pertaining to the Matheson manifold, including an original specimen. It is illustrated also in the Tice article, and its priority and use are beyond dispute. The Peerless is illustrated in its 1913 catalogue, and its priority and use are likewise beyond question. Both are of the same type. The riser, header, and branches are circular in form, but they do not embody the substance of Swan's invention. The riser is widely flared at its intersection with the header, and the branches turn towards the engine on a gradual curve. The flaring of the riser top would slow down the travel of the mixture, and would permit the wet particles to adhere to and follow the flaring of the curve rather than be projected perpendicularly from the riser into the zone of turbulence formed by the intersection of the riser

and header. The same tendency is present at the curved intersections of the header and branches. These differences distinguish fundamentally Matheson and Peerless from Swan. In no other patent, publication, or use is shown a closer approximation to Swan, unless it should be in the article by Ensign, published in Automotive Industries in 1920. Ensign realizes the advantage of having the inner bend at the intersection of the riser and branch at right angles, but does not disclose a complete manifold, and discloses nothing as to the connection between the riser and header or as to the size and contour of the several elements. It does not appear that Ensign's incomplete disclosure was ever embodied in a manifold. As to Matheson and Peerless, it may be said that both disappeared from the market years ago and were supplanted by other manifolds, while Swan's, since its appearance, has not only been adopted by defendant, but by numerous other makers of automobiles, and is enjoying a wide and extended commercial success.

Defendant's structure has header, riser, and branches, round in form, but of the same area, and without curves, obstructions, or recesses in the line of travel. The riser joins the header at an abrupt right angle. The header and the branches form on their inner bend an abrupt right angle. The floor of the header and its branches is on the same level and without curves in the line of travel. Defendant made and sold one type of manifold, known in the record as the Oldsmobile manifold, which is a counterpart of the one now involved; except that there was a slight recess or flat dome above the riser, and on which it paid royalties.

Defendant has adopted and uses a Marvel heater surrounding the riser. It contends that the mixture is completely vaporized while passing through this heated zone, and hence that the problem of mixing and vaporizing in the header and branches, which Swan sought to solve, is not only not involved, but is solved in another and different manner. If this contention be true, and no problem remained in the matter of vaporization and equal distribution between branches and cylinder ports, then it is difficult to perceive why defendant should preserve in its manifold these elements of Swan's invention. It would have been easy to go back to Matheson or Peerless. If these elements of Swan thus preserved possess no advantage in vaporizing and distributing a mixture so heated, no reason is perceived why Swan should not have been wholly discarded.

Defendant, to support its contention that the mixture is thus fully vaporized by its Marvel heater, and that no wet mixture is left involving any problem of further vaporization or distribution, made a test in my presence at the White Motor plant of one of its engines. The results of this test did not carry full conviction. Admittedly, under certain conditions of starting and load and speed, the mixture was foggy and even wet. Moreover, the manifold and exhaust immediately became red hot, much beyond any temperature conditions to be expected in operation. Furthermore, the only means of observation were through small glass windows at the ends where the branches turn, and as a result, one's opportunity to see and observe was too limited to justify a definite finding. It may be admitted that the defendant's manner of injecting the mixture from the carburetor into the riser and the effect of the Marvel heater is to preheat and greatly vaporize the mixture before it enters the header. In view of all the circumstances, this is not sufficient to show that Swan's invention is not being appropriated. It cannot be said that under certain conditions of starting, load, and speed, the problem of further vaporization and equal distribution does not remain and is not solved by defendant by the use of certain elements of Swan's invention.

The patent claims are twenty-three in number, all of which, with the exception of 12, 13, and 14, plaintiff contends, cover defendant's manifold. Some of them certainly do. Hence no detailed discussion of the claims is required, nor would even be helpful. The first ten are method claims, of which claim 4 may be taken as typical. The remaining claims are for the device. Claim 23 may be taken as the most specific and detailed. Against the applicability of claim 23, defendant urges that the wall of the chamber opposite the riser or intake is not symmetrically formed, as is called for by the claim. Defendant's riser and header being circular in form and meeting each other at right angles, it is said that the opening to the middle branch destroys this symmetry and deprives the defendant's manifold of the mixing zone or chamber such as is called for by that claim. If the words "symmetrically formed" stood alone, it might be admitted that there is a slight asymmetry due to the presence of a wall on one side of the riser and its absence on the other side. But the qualifying language used in the claim discloses that absolute geometrical symmetry is not what was intended. On the contrary, the symmetry in

question has reference to the various outlets from the header. The object of this zone is to uniformly influence the mixture entering this chamber and cause it to be distributed in uniform character in the direction determined by the outlets and the induction cycles of the engine. Defendant's manifold, in my opinion, does so operate. Defendant is making, using, and selling manifolds appropriating Swan's invention and covered by some, if not all, of the claims in question of Swan's patent, and must be held liable for the payment of royalties thereon.

■ 3. The parties have stipulated the number of manifolds made and sold on which royalties have not been paid. Paragraph 6 of the license agreement is: "Should United States Letters Patent corresponding to said patent applications not be granted within a period of eighteen months from the date of this present agreement, all royalty payments as herein set forth shall cease, and licensee shall thereafter be immune from any claim by licensor for royalty or otherwise in respect to licensee's products until such time as Letters Patent of the United States shall issue covering such products." Inasmuch as the license agreement is dated June 6, 1923, eighteen months thereafter would be December 6, 1924, and, inasmuch as Swan's patent did not issue until April 28, 1925, defendant, under favor of the quoted clause, denies liability for royalties during the intervening period. Plaintiff contends that clause 6 merely suspends payment until a patent issues, but does not exempt defendant from liability to pay after a patent has issued. In my opinion, defendant's contention is sound. The language is not only that all royalty payments shall cease, but that the licensee shall be immune from any claim for royalty or otherwise until a patent issues. It would have been easy to say that payments should have been suspended and not become due until the patent should issue. If the parties had so meant, apt language to express that intent could readily have been found. A grant of immunity from any and all claims, either for royalty or otherwise, means precisely what it says. The licensee would not be immune if the due date for payment only were postponed. He would remain liable just as if this language had not been employed. Hence the royalties accruing from December 6, 1924, until April 28, 1925, will not be included in plaintiff's recovery. Judgment as prayed will be rendered for the amount otherwise stipulated to be due.