Merrell E. Clark, of New York City (Charles H. Walker, of New York City, on the brief), for appellant.

F. O. Richey, of Cleveland, Ohio (F. M. Bosworth, of Cleveland, Ohio, Edwin F. Samuels, of Baltimore, Md., and Richey & Watts, of Cleveland, Ohio, on the brief), for appellee.

**NASH MOTORS CO. v. SWAN CARBURETOR CO.**

No. 4454.

Circuit Court of Appeals, Fourth Circuit.

June 21, 1939.

Before PARKER, NORTHCOTT, and SOPER, Circuit Judges.

SOPER, Circuit Judge.

The District Court held in this case that the Nash Motors Company had infringed United States patent No. 1,536,044 of 1925 to John W. Swan, relating to the inlet manifold in an internal combustion engine. A decree for an injunction and for damages and profits, to be fixed by a special master, was granted to the Swan Carburetor Company, owner of the patent.

The same patent has been the subject of litigation in Swan Carburetor Co. v. General Motors Corp., D.C., 42 F.2d 452, affirmed on appeal on a procedural question in General Motors Corp. v. Swan Carburetor Co., 6 Cir., 44 F.2d 24, and also in General Motors Corp. v. Swan Carburetor Co. and Reeke-Nash Motors Co. v. Swan Carburetor Co., 6 Cir., 88 F.2d 876. In these cases the validity of the patent was sustained. The Nash Motors Company, defendant in the District Court in the pending case, was in privity with the appellant in Reeke-Nash Motors Co. v. Swan Carburetor Co., supra, and hence is bound by the decree there rendered. In that case, certain manifolds manufactured by the Nash Motors Company, designated herein as Nash No. 1 or the adjudicated Nash manifolds, were held to be an infringement of the patent. The answer in the pending suit disclosed that the Nash Company is now using a different type of manifold, called herein the Nash No. 2 or the accused Nash manifold, and the plaintiff moved to strike out the portions of the answer referring thereto on the ground that the proceedings in Reeke-Nash Motors Co. v. Swan Carburetor Company in the Sixth Circuit were of such a nature that the Nash Company is estopped here to deny infringement not only by the first, but also by the second group of manifolds. On appeal from an order refusing to strike, we held, 4 Cir., 98 F.2d 115, that the defendant was not so estopped, but was entitled to show, if it could, that its second group of manifolds do not infringe the patent.

The charge of infringement is based upon the similarity of the second group of Nash manifolds to the first group, which were adjudicated to infringe in Reeke-Nash Motors Co. v. Swan Carburetor Company, supra, and upon the holding in that case that the first group resembled the structure of the Swan patent more closely than the Matheson manifold, a prior art structure upon which the defendant in large measure relied. The defense in the pending suit is based on the contention that after the decision of Swan Carburetor Co. v. General Motors Corp., supra, the Nash Company discontinued the use of its first group of manifolds which were like those held to infringe in that case, and has since used the second group, which are in all essential details the same as the Matheson structure. The Nash Company was in fact using the second group of manifolds at the time that the Reeke-Nash case was reached for trial. Thus we have two opposing principles bearing on this case and leading to opposite results, on the one hand, the estoppel of the judgment in the Reeke-Nash case, whereby the defendant is precluded from denying the validity of the patent or that its first group of manifolds infringes the patent, and on the other hand, the limitation of the prior art upon the scope of the patent whereby the plaintiff is precluded from claiming that the patent is broad enough to include the Matheson structure. Both principles must be given effect if it is reasonably possible to do so.

The invention relates to a method and a means, such as an intake manifold, of conducting and delivering a mixture of air and fuel from a mixing device, such as a carburetor, to the cylinders of an internal combustion engine. We are concerned only with a single claim of the patent, No. 20, which describes the means employed in the following terms:

"20. In an inlet manifold, a distributing chamber having a single inlet conduit and three branch conduits, one of the walls of the chamber being opposite the inlet duct and symmetrically formed and situated with reference to the branch ducts so that entering fluid may be influenced by said wall uniformly in all directions transverse to the entering stream, and the branch conduits being of substantially uniform shape throughout and at any turn thereof presenting similar walls shaped and situated so that passing mixture may be influenced thereby in a manner to distribute equally to cylinders to which said turns may lead."

This description indicates that the device consists of an inlet conduit, a distributing chamber and three branch conduits of uniform shape throughout, so arranged that the fluid from the inlet conduit enters the distributing chamber and then strikes against the opposite wall thereof, whereby the stream is influenced to move uniformly in all directions transversely to its prior course. Thereby the fuel is sent on its way to the cylinders, but before reaching the cylinders, it again strikes against walls so situated at the turns into branch conduits that the mixture is distributed equally to the cylinders to which the turns may lead.

This description is quite general in its terms and gives scant information of the

means devised to accomplish the desired result. It is necessary, therefore, to turn to the specifications for a more precise description of the invention. There we are told that the main object is to deliver the mixture of air and fuel from the carburetor uniformly to all the cylinders; and that the movement of the fuel from the intake conduit to the successive cylinders is determined by the firing order of the cylinders, so that the fuel passes through a different branch conduit each time a cylinder takes its charge. The mixture of vaporized gasoline and air, as it comes from the carburetor, contains particles or globules of the fuel in liquid state, which, to some extent, are still in that state when they reach the cylinders. The volume of air required is many hundred times the volume of the liquid particles so that misdirection of the latter greatly affects the ratio of the entering constituents. The means by which the mixture is carried in correct proportions to all the cylinders with equal facility is the gist of the patent. A distributing chamber is formed by the juncture of a vertical conduit or riser, which connects the carburetor at its lower end to a horizontal conduit or header situated above. Intersecting the header on the same horizontal plane in a six cylinder engine are three branch conduits, of which one proceeds from the middle, and one from each end of the header. Each branch conduit serves two cylinders. The distributing chamber, and the bends at the ends of the header, where it joins the end branches, are the portions of the manifold to which claim 20 of the patent particularly refers. The shape of the conduits and the manner in which the riser and the branch conduits meet the header create the desired influence upon the course and direction of the mixture in its passage through the structure, so that there is no deflection of the mixture which would divert more fuel to one exit opening than another, or which would disturb the ratio of the constituents.

The greatest separation of the constituents of the mixture or disturbance of fuel ratios takes place whenever there is a turn or change in the direction of the moving mixture, because the centrifugal force tends to throw the heavy liquid particles out of the line of travel and to separate them from the mixture. The patentee offsets this tendency in his preferred construction by making "all of the manifold, including the intake, the distributing chamber, branches and outlets, angular in cross section," and by making the angles sharp where the riser and the branch conduits join the header. By this formation the moving mixture is projected against an opposing wall of the header at the turns and a remixing of the constituents is effected.

It is important to note, however, that the patentee does not confine himself to this precise construction. He says that an angular construction of the various members of the manifold is preferable, "but round, hexagon, octagon or other cross sectional shapes may in instances be resorted to. For example, in Figure 9, I have shown a detailed section of one of the branches with its turn leading to an end cylinder or cylinders, *the inside angle of the turn being sharp* and the outside rounded. Good results may be obtained in a modification of this character in view of the fact that the wet constituents of the fuel will be caused to be projected beyond *the sharp inside angle* into the air at the turn, effecting a remixing of the constituents incident to the change of direction thus created at the turn." (Italics supplied.)

In Swan Carburetor Co. v. General Motors Corp., D.C., 42 F.2d 452, in which an excellent description of the patent is given, Judge Westenhaver thus summarizes the teaching of the inventor, 42 F.2d at page 455:

"His fundamental conception is and was that by changing abruptly at right angles the line of travel of the mixture, and by eliminating all obstructions, curves, or recesses in that line of travel, the tendency of the wet particles to collect at one place more than another would be avoided, and that, whenever the line of travel was thus abruptly changed at right angles, the wet particles would be thrown toward or beyond the main current and be mixed with the air and fully vaporized. In this way he asserts that an area of agitation or turbulence or mixing zone is created at each intersection where a sharp right-angled turn is made, and thereby the mixture is completely vaporized before it reaches the engine ports, and that no branch or port is more favored in the distribution than another."

It was also noted in the opinion that although Swan stressed the square or rectangular form, he did not exclude other forms; and it was therefore held that the

General Motors' manifold, which was round in cross section, infringed the patent because it was without curves, obstructions and recesses in the line of travel, and the riser joined the header at an abrupt angle, and the header, at its junction with the branches, formed an abrupt angle on their inner bends.

This General Motors' manifold was substantially identical in construction with the first group of Nash manifolds that were held to infringe the patent in Reeke-Nash Motors Co. v. Swan Carburetor Co., 6 Cir., 88 F.2d 876, 877. It is also true that in the companion case, General Motors Corp. v. Swan Carburetor Co., 6 Cir., 88 F.2d 876, although the opinion does not clearly show it, the jury found that a structure, substantially similar to the second group of Nash manifolds under consideration in the pending case, resembled Swan rather than Matheson, and therefore infringed the patent. See 88 F.2d at page 884. But the Nash Company was neither a party nor privy to the latter suit, and is therefore entitled to a reexamination of that question in this case in the light of the evidence here adduced; and this is especially true since in the pending case the court has had the advantage of the testimony of Professor Alexander Graham Christie, a neutral expert appointed by the court with the consent of both parties. The judgment in the Reeke-Nash case, relating to the first set of manifolds, is of course no bar to the inquiry since the estoppel of a prior judgment extends only to matters litigated or which might have been litigated in the former case. See General Motors Corp. v. Swan Carburetor Co., 6 Cir., 88 F.2d 876, 884.

The distinction between the first group of Nash manifolds and the second group of Nash manifolds is that, while both have rounded outside corners at the turns, the first group embodies sharp inside corners at the junction of the riser with the header, and at the junctions of the branches with the header, whereas in the second group these corners are rounded or curved. The District Judge found that notwithstanding these structural differences the manner in which the mixture passes through the manifold and the results obtained are substantially the same in both groups, and are also the same in the structure described in the Swan patent. This conclusion accords with the opinion of the neutral expert, and with the weight of the evidence. It is true that to the extent that the manifold is constructed with conduits of round rather than angular cross section, and with rounded rather than the angle turns, the tendency of the mixture to go into a spiral motion at the turns is more pronounced; but this is not of material significance because the desired turbulence and remixing of constituents nevertheless takes place. Upon these facts the District Judge, following the similar decision in the Sixth Circuit in General Motors Corp. v. Swan Carburetor Co., supra, concluded that infringement of the patent by the second Nash group was established in the instant case.

Weighty considerations, it must be said, led to this result; but in our opinion, they are not so persuasive as the fact, also found by the judge, that in the means employed and results obtained, the accused Nash is closer to the prior art of Matheson than it is to the adjudicated Nash or to Swan. The only difference between the accused Nash and Matheson in the configuration of the conduits is that the former is reduced in size to fit the smaller Nash engine. The reduction in size was made in accordance with engineering principles so as to obtain the same effects in the smaller as in the larger structure. Thus, in order to maintain the same velocity of the mixture, the diameter of the second Nash was reduced so as to maintain practically the same ratio of manifold area to piston displacement, upon which ratio the velocity depends; and in order to secure the same effect of the bends upon the mixture passing through, the radii of the curves were reduced in the same proportion as the diameter of the conduits was reduced. With one exception, the radii of all curves in the second Nash are proportionately reduced to the nearest 64th of an inch. The exception is the radius of the curve at the inside corners at the junction of the riser with the header. This radius is one inch and should be 1-$\frac{9}{64}$ inches in length, a difference of no practical importance so far as the operation is concerned, according to the evidence.

In opposition to this set of facts, the appellee points to a difference between the two structures in that the branch conduits, leading from the header to the cylinders in the Nash, are proportionately longer than those in the Matheson; but

the patent has to do with the configuration of the interior passages and makes no reference to the length of the branches except to show that if the branches are short, the invention is especially useful. The variation in length in the branches of the second Nash as compared with Matheson indicates, if anything, a departure from the patent. In essentials, the second Nash follows Matheson more closely than Swan.

The validity of the patent being established for the purposes of this case by the earlier decision, infringement of the patent by the second Nash is apparently indicated by its similarity to Swan in operation and results; and, on the other hand, the closer similarity between the second Nash and the prior art of Matheson indicates that the second Nash is outside the scope of the patent. How shall the conflict be resolved? In our opinion, by reference to the specifications of the patent which indicate that an essential feature of the patented structure is the sharp inside angle at the turns of the manifold, a feature which is found in the first Nash and in Swan, but is not found in the second Nash or in Matheson. The specifications do show in the description and in the drawing that conduits with other than an angular cross section may be employed, and that outside turns may be curved; but nowhere is it shown that the inside turns may be curved. On the contrary, both the language of the specifications and the drawings indicate that the inside angle of the turns must be sharp. This was the opinion of Judge Westenhaver in Swan Carburetor Co. v. General Motors Corp., D.C., 42 F.2d 452, supra. As we have seen, he rejected the contention that the Swan invention was limited to a manifold whose elements are substantially square or rectanguler in cross section. Referring to passages in the specifications which justified a broader claim, he said, 42 F.2d at page 456:

"In Fig. 9 of the issued patent is disclosed a round header and branch as an optional form. In the specifications, pages 4, 11, 6–24, Swan points out that, while it is preferable to make the manifold, including the intake, distributing chamber, branches, and outlets, angular in cross-section, he also points out that round, hexagon, octagon, or other cross-sectional shapes may also be used. *He further notes that, while the outer angle of the branches leading to the cylinder may be curved or rounded, the inside angle of the turn must be sharp.* He says: 'Good results may be obtained in a modification of this character, in view of the fact that the wet constituents of the fuel will be caused to be projected beyond *the sharp inside angle* into the air at the turn, effecting a re-mixing of the constituents incident to the changed direction thus caused at the turn.' It is these fundamental principles which Swan conceived and sought to apply to the mixture in its passage from the carburetor to the cylinder.

"* * * In the round form, as in the square, we have a floor without curves, recesses, or obstructions in the line of travel. In the round form the mixture travels in straight, if not in rectilinear, lines, except when its direction is changed, and, whenever it is so changed, that change of direction is at an *abrupt right angle.* In the round, as in the square form, the heavier or wet particles are thrown violently toward or beyond the center of the line of travel. Thus there is created a zone or area at the intersection of the riser and header, as well as at the intersection of the header and branches, in which there is that agitation or turbulence which is insisted upon by Swan as the best means of thoroughly vaporizing the mixture and delivering the same equally to each cylinder without favoring one over another." (Italics supplied.)

Then, referring to the contention that the Swan patent was necessarily narrowed by the prior art, and speaking of Matheson, the judge said, 42 F.2d at pages 456, 457:

"The riser, header, and branches are circular in form, but they do not embody the substance of Swan's invention. The riser is widely flared at its intersection with the header, and the branches turn towards the engine on a gradual curve. The flaring of the riser top would slow down the travel of the mixture, and would permit the wet particles to adhere to and follow the flaring of the curve rather than be projected perpendicularly from the riser into the zone of turbulence formed by the intersection of the riser and header. The same tendency is present at the curved intersections of the header and branches. These differences distinguish fundamentally Matheson and Peerless from Swan."

Our reading of the patent would lead us to believe, as it did Judge Westenhaver, that it is the change of direction at "an

abrupt right angle", at "the sharp right angle", at the turn which causes the wet constituents of the fuel to be projected into the air and remixed so as to achieve the object of the patent. This was also the reading of the neutral expert, highly trained in the engineering field. It appears from the evidence now before the court that the patentee was mistaken in supposing that the desired effect could be produced only by the structure he described. The turbulence and remixing takes place with curved as well as sharp inside corners. Indeed tests made under the observation of the neutral expert convinced him that the same results could be produced not only with the Matheson manifold, but also with manifolds containing curves even more gradual than Matheson. It is contended that unlike the comparative tests of Swan, Nash No. 1 and Nash No. 2, these tests were incomplete and inconclusive because they did not comprehend a sufficient range of temperature, from hot to cold, to which an automobile in practical use is necessarily subjected, and also because, as to the Matheson structure, the structure tested did not accurately represent the prior art. Granted that these tests were inconclusive, it does not follow that Matheson has no significance in this case. Its efficacy has been established by the complete tests to which its mechanical equivalent, the second Nash, has been put; and there is no persuasive showing to the contrary. There is certain testimony tending to show that in the state of the automobile art in 1910, 1911 and 1912, certain difficulties were encountered in the operation of the Matheson car; but not only was this testimony contradicted by equally credible testimony, but it is proved that for a number of years prior to 1913, when business misfortunes brought about a cessation of manufacture, the Matheson car was recognized as an important competitor in the high class field. The evidence before us does not justify the finding that the Matheson manifold was a prior effort and failure. The performance of the second Nash manifold is proof to the contrary.

Although what has been said casts some doubt upon the validity of the patent, it must be assumed to be valid in this case; but it is nevertheless right and proper to interpret the patent so that it will not cover the productions of those earlier in the field. It is not necessary to interpret the patent so as to cover the Matheson manifold. Indeed to do so, as we have seen, would run counter to the disclosures of the inventor. We therefore conclude that the accused Nash, which followed Matheson, does not infringe the patent, and that the bill of complaint should have been dismissed as to the second group of Nash manifolds. The judgment of the District Court must be reversed and the case remanded for further proceedings in accordance with this opinion.

Reversed and remanded.

PARKER, Circuit Judge (dissenting).

For reasons adequately stated in the opinion of the District Judge, I am of opinion that the patent in suit is infringed by defendant and that the decree appealed from should be affirmed. It is perfectly clear to my mind that the accused device of defendant is the equivalent of the device which was held to infringe in the Reeke-Nash suit; and I do not think that defendant should be permitted to evade the decree therein rendered by any such inconsequential changes in structure as are here involved. As to the rounded inside corner of the accused device, I do not think this sufficient to avoid infringement. As said by the master in the Reeke-Nash suit:

"Nothing in the prior art restricts the claims of the patents in suit heretofore enumerated, which define the apparatus or combination of elements patented therein to the preferred form of Swan's patented manifold with square rectangular cross-section, or with sharp right angled inside corners or with flat walls opposite the riser and at the ends of the header, and nothing in defendant's adoption of the manifolds here charged to infringe of round cross-section with slightly rounded inside corner and wholly or partly rounded walls opposite the riser and at the ends of the header, is in such accordance with any prior art manifold or the teaching of any prior art patent or publication or is in such accordance with any prior art construction with respect to function, mode of operation, or results that any of defendant's manifolds can be said to fairly differentiate from the patented construction or combination, or can be said to be made in accordance with or in substantial accordance with any manifold or complete combination shown to have existed in the prior art."

As pointed out by the judge below, this finding, along with the other findings of

the master, was adopted without opinion by the District Court in the Reeke-Nash suit and presumably was affirmed by the appellate court. If not binding upon defendant upon the principle of res adjudicata, it is highly persuasive as to what our finding should be, not only because of its inherent reasonableness, but also because of the high authority of the courts by which it was given approval. It is strengthened, not merely by its adoption by the learned judge below, but also by the fact that in reaching his conclusion upon the case he had the assistance of a most distinguished non-partisan expert.

It is not the sharp inside corners, but the sharp change in direction of the gas flow caused by the outside corners which is the essence of Swan's invention. As said by the Circuit Court of Appeals of the Sixth Circuit in the Reeke-Nash case (88 F.2d 876 at page 887): "Swan's inventive concept consisted in bringing the fuel mixture from the carburetor to header in substantially straight lines, and so abruptly changing its course in the header and at the branches as to create a maximum turbulence at the points where direction of flow changed with resulting remixture of the heavy particles of gasoline and air. This concept was new. With it Swan combined forms which, while old, produced a straight line in the longitudinal flow of fuel mixture. This combination was new. The turbulence and its creation within a structure which avoided the dangers of excessive puddling were his main contribution to the art."

The patent in suit made a valuable contribution to the art. Its validity has been upheld in a number of suits brought in a jurisdiction whose judges are much more familiar than the courts of any other Circuit with questions affecting the various mechanical devices used by the automobile. Swan Carburetor Co. v. General Motors Corp., D.C., 42 F.2d 452, affirmed 6 Cir., 44 F.2d 24; General Motors Corp. v. Swan Carburetor Co. and Reeke-Nash Motors Co. v. Swan Carburetor Co., 6 Cir., 88 F.2d 876. Its validity has been upheld against this defendant, who has been held guilty of infringing it. The finding of non-infringement here is based upon an immaterial change in structure, which was before the court in the former infringement suit on a contention that the change was immaterial and that the device there held to infringe should be held not to in-

fringe because of the immateriality of the difference. The finding of non-infringement is in direct conflict with a finding in one of the last General Motors cases affirmed by the Sixth Circuit, 88 F.2d 876; and its effect is that, while paying lip service to the validity of the patent, we in effect nullify it, and do so on the basis of the supposed resemblance of the accused device to a structure in the prior art, which had proven a failure and over which the device of the patent in suit had made an improvement of great value. With all respect to the opinion of my brethren, I feel constrained to dissent from their decision.