**TIMKEN–DETROIT AXLE CO. v. ALMA MOTOR CO.**

No. 198.

District Court, D. Delaware.

Sept. 23, 1942.

William A. Strauch, James A. Hoffman, J. Matthews Neale, and Strauch & Hoffman, all of Washington, D. C., and E. Ennalls Berl and Southerland, Berl & Potter, all of Wilmington, Del., for plaintiff.

S. Samuel Arsht, of Wilmington, Del., and George Rex Frye, of Detroit, Mich., for defendant.

584

KIRKPATRICK, District Judge.

In this action the plaintiff, under the Declaratory Judgment Act, asks the Court to determine certain questions of law and fact, arising in connection with the defendant's patent No. 2,173,044 (issued to Ruggles and Smith September 12, 1939) and an agreement by which the plaintiff became a licensee. The patent is for mechanism known as a transfer case—an auxiliary transmission by which the drive of the engine of an automobile truck may be extended to the front axle as well as to the rear. In substance, the relief asked for is that the Court declare that the patent is invalid, that the transfer cases manufactured by the plaintiff do not come within its claims as construed in the light of the prior art, and that, under the license agreement or, in spite of it, the plaintiff is not bound to pay royalties upon any of the transfer cases now being manufactured by it. The defendant has counterclaimed asking judgment for damages for the plaintiff's failure to pay royalties.

In the early part of 1938, the plaintiff, Timken, the defendant, Alma, and a third company, Harrington, were in interference, each with a patent application for a transfer case. The three devices were essentially the same and there were 15 counts in the interference. After some preliminary sparring in the Patent Office, there was a meeting between representatives of the three parties at the Book-Cadillac Hotel in Detroit in May 1938 at which it was agreed that Alma should have the patent and would license the other two when it issued. There are some indications of a general feeling that the patent, even if valid, would not be of outstanding importance and that its ownership was not worth litigating. After the conference, Timken and Harrington formally conceded priority to Alma, Alma disclaimed certain counts of the interference which the parties had agreed were anticipated by prior art which had been produced and studied at the conference, and Alma and Timken executed the license agreement in question, Harrington dropping out because it had come to the conclusion that it did not want to manufacture the cases.

There were actually two contract documents executed, the first on May 16, 1938 and the second on May 26, 1938, but I think they may be considered together as though they were a single license agreement. The second embodied the essential terms of the first, and the parties are apparently in agreement that the recitals in the earlier document should be considered in determining the scope and construction of the later one.

■ The first question is whether or not Timken is estopped to contest the validity of the patent. I am of the opinion that it is estopped to raise that issue, and therefore will not adjudicate the patent in this proceeding.

■ The rule that a licensee may not contest the validity of the patent under which he is licensed is well settled and has long been a part of the patent law. In this case Timken endeavors to avail itself of several avenues of escape from the estoppel.

First, Timken contends that this license, by its terms as interpreted in the light of the recitals, intends that the licensee shall be free to contest the patent. I do not so read the agreement. The contention is based on the first recital of the agreement of May 16 and on Clause IV of the second document, which is practically identical with Clause VI of the first document.

■ The recital, of course, was intended to define the subject matter. It is a statement that Ruggles and Smith have invented certain improvements, which improvements are further described as transfer cases and identified as the ones disclosed in the Ruggles and Smith application then pending. Then Alma licenses Timken to make, etc., "the said improvements" and Timken agrees to pay royalties upon transfer cases "embodying said improvements." Then there is a clause the meaning of which is that, after the issuance of the patent, the royalties shall be paid only if any of the claims dominate the transfer cases made by Timken. I think it perfectly plain that the intention was to pay royalties on transfer cases coming within the terms of the claims of the patent as issued. I do not think that the incidental use of the word "invented" meant that it was intended the licensee was to be free to contend that his obligation to pay royalties was not coextensive with the issued patent as defined by its claims. Five patent lawyers participated in the conference, and at least two in drawing the agreement. They understood the rule that estops a licensee and certainly would have provided against it in plainer terms than these had that been the intention of the parties. But

even if it were possible, by emphasis upon the word "invented", to whittle down the scope of the license to something less than the patent, I should say that the recital estopped Timken to deny that Ruggles and Smith had invented the improvements just as much as the license estops it to contest the validity of the patent.

The assertion in Timken's brief that Alma represented that Ruggles and Smith invented the improvements in question is not entirely correct. Actually, it was as much Timken's assertion as Alma's. Both parties executed the agreement and both agreed to the recital. They had before them practically the same prior art which was presented at the hearing. As a matter of fact Timken's lawyers knew more about the prior art than Alma did, an important use having been shown to Alma's counsel, for the first time, only a few hours before the conference.

The clause referring to the issuance of a patent with claims dominating transfer cases made by Timken seems to have been inserted, from an excess of caution, to be sure that "said improvements" could not possibly be construed to cover any improvements disclosed by the pending application which might be eliminated or extensively modified in the issued patent. If anything, this clause only serves to make stronger the inference that the subject matter of the license was improvements as described in the patent claims.

The provision contained in Clause IV does not permit the licensee to contest the validity of the patent. This point is settled by the decision of the Supreme Court of United States v. Harvey Steel Co., 196 U. S. 310, 25 S.Ct. 240, 49 L.Ed. 492.

Another ground for Timken's contention that it is not estopped is the public interest involved in any adjudication involving the validity of the patent. There have been cases in which public interest has been said to be a justification for allowing a licensee to contest validity but, as pointed out by this Court in Crom v. Cement Gun Company, 46 F.Supp. 403, in an opinion filed June 25, 1942, but not yet reported, this is only in exceptional cases. Such a case was Standard Water, etc., v. Griscom-Russell Co., 3 Cir., 278 F. 703. That decision as pointed out by this Court in the Crom case did not change the general rule for the Third Circuit. I find no circumstances in the present action

which requires a consideration of the validity of this patent in the public interest. I am not adjudicating its validity. I am merely holding that this plaintiff may not contest it, and I do not think the public is interested in whether Timken pays royalties to Alma or not, which is the only thing at issue here. I might go further and say that an issue which the party who attempts to raise it is estopped to contest does not present a justiciable controversy under the Declaratory Judgment Act, 28 U.S.C.A. § 400.

Another point made by Timken is that it may contest the patent on a plea of failure of consideration. There are decisions establishing an exception to the rule on that ground, but it takes more than merely an assertion of invalidity or even the fact of invalidity to show failure of consideration. The typical case in which it has been allowed to toll the estoppel is where general competition by unlicensed manufacturers who have gone ahead in disregard of the patent has made it wholly valueless to the licensee.

Although estopped to contest the validity of the patent, a licensee is not precluded from showing the state of the art, for the purpose of construing the claims. If, in the process, the claims should be held to mean something narrower than might appear from the literal reading of them, the licensee is entitled to the benefit of that, on the question whether or not he must pay royalties. See Westinghouse Electric & Mfg. Co. v. Formica Insulation Co., 266 U.S. 342, 45 S.Ct. 117, 120, 69 L. Ed. 316. This is the rule of the patent law, and it is not affected by reference in this agreement to a patent with claims dominating transfer cases made by Timken. The purpose and meaning of that clause has been pointed out and I think that it has no effect upon the extent of the use which may be made of prior art in this case. That is defined by the general rule in the Formica case.

At this point it may be convenient to dispose of two fact issues, before taking up the question, which of the Timken transfer cases are subject to royalties.

1. I find as a fact that there was no definite agreement on the part of Alma to bring the Spicer use to the attention of the Patent Examiner in the course of further prosecution of the patent. If any suggestion was made, which I rather doubt, it

was not with the intention that it should be a definite obligation upon Alma and did not constitute an inducing cause of the agreement. Consequently, Alma's failure to bring the Spicer use to the attention of the Patent Examiner has no effect upon and does not discharge Timken's obligation in respect of royalties.

■ 2. The date of conception of the invention patented by Ruggles and Smith was prior to October 27, 1933. The inventors exercised reasonable diligence from conception to reduction of practice. The Spicer transfer case does not constitute prior art against Ruggles and Smith.

The Spicer transfer case was one of the mechanisms considered as prior art at the Book-Cadillac conference, although Alma's representatives asserted that their invention antedated it. Both the Spicer and the transfer case of the patent were developed in their final form in the latter part of 1933. The date set by the plaintiff for the first public use of Spicer is November, 1933, when a White Motor Company truck incorporating the Spicer transfer case was sent to Camp Holabird for test.

To establish a date of conception for the patent in suit a number of blueprints made or used by the inventors were produced (DX-22 and the DX-23 series) from the group in the Alma files on transfer cases. The authenticity and accuracy of the dates on these blueprints has not been questioned. They represent drawings of (1) a complete single-speed transfer case (DX-22), which does not embody the subject matter of the patent, (2) a complete two-speed transfer case (DX-23V), and (3) various single elements or parts of both, in no particular order as to dates or numbers. The complete single-speed assembly and many of the drawings of parts are undated. A number of the parts could be used only in the single-speed transfer case and those of this class which are dated range from February to August or later in 1933. Some are probably interchangeable and the dates of these range from February to December. Others could be used only in the two-speed transfer case and most of these are either undated or were drawn in December, as was the only dated drawing of the complete two-speed assembly. One drawing, however, (DX-23k) of the shiftable gear on the upper shaft of the two-speed transfer case is dated October 27, 1933. This part could be used only in the two-speed transfer case and is of the same dimensions as the sliding gear in the December 29 drawing of the whole assembly. Both drawings also specify "20 teeth 6 pitch". While the parts in the drawings of the whole two-speed assembly are numbered, and some of the drawings of individual parts are numbered to correspond, the blueprint of the sliding gear of October 27 either is not numbered or the shop-number is obscured. However, there can be no doubt whatever of the nature of the individual drawing, and the Ruggles and Smith date of the conception must, therefore, have been prior to October 27.

It seems to me that the whole question of the priority of Spicer is more or less academic, and I have gone into it only because an Appellate Court might think otherwise. Each of the Timken devices upon which royalties are claimed are so much nearer to the Ruggles and Smith construction than they are to Spicer's, that, even if limited by Spicer as prior art, the claims would still include most of the Timken cases.

Coming now to the question of applying the claims to the transfer cases manufactured by Timken:

■ Under the rule of the Formica case, supra, " * * * the state of the art cannot be used to destroy the patent and defeat the grant, because the assignor is estopped to do this. But the state of the art may be used to construe and narrow the claims of the patent, conceding their validity. The distinction may be a nice one but seems to be workable." In practical application this must mean that the scope of the claims shall be coextensive with their novelty. The estoppel eliminates the question of invention and leaves novelty as the criterion, and if a claim is not anticipated it is immaterial whether or not its novelty constitutes an inventive step. To this extent, at least, the distinction is workable.

Before proceeding with the consideration of the particular claims, five of the twenty Timken transfer cases upon which royalties are claimed by the defendant may be entirely eliminated from the general discussion and four others reserved for special consideration.

■ (1) T-79, T-79-1 and T-79-4 do not infringe any of the claims as limited by the prior art. These transfer cases do not employ the Ruggles and Smith gearing and

are more complex, thus falling short of the simplicity which is, perhaps, the essential and underlying novelty of the patent. See answer to the plaintiff's 12th request for fact finding.

(2) During the course of the trial, the defendant's attorney made the unqualified statement that royalties were not claimed upon any transfer cases which did not include a front-wheel drive. This declaration must be taken as binding upon the defendant, and thus T-32-17-1 and T-32-17-2 (which do not drive front wheels from the secondary output shaft but are adapted for use in a 6 x 4 truck where the four rear wheels are driven) drop out of the case. With these devices out, it makes no difference whether or not claims 6 to 12 are limited to front-wheel drive constructions, as the plaintiff contends they should be.

(3) The following devices will be reserved for consideration in connection with claim 10: T-32-13-2, T-32-13-4, T-32-13-5 and T-32-13-6, in which there is no internal declutch as required by the first four claims and the driven upper shaft (in one end of which the input shaft is piloted) is capped and, therefore, not a power shaft as required by all the other claims except 10. In these Timken transfer cases the power for both rear and front wheels is taken from the lower shaft.

As a basis for the discussion of the scope of the claims, claim 1 may be taken as typical. It is:

1. In an auxiliary gear box,
   (a) a drive shaft,
   (b) a driven
   (c) shaft,
   (d) a gear on the (driven) shaft,
   (e) one end of the drive shaft being piloted in said gear,
   (f) internal
   (g) clutch teeth
   (h) in said gear,
   (i) intermediate shaft
   (j) with gears mounted thereon
   (k) to rotate therewith,
   (l) one of said gears meshing with the gear on said driven shaft,
   (m) a shiftable creeper gear mounted on the drive shaft
   (n) and shiftable into and out of engagement with one of the intermediate gears and/or
   (o) the (internal) clutch teeth on the (driven) shaft gear,
   (p) a second driven shaft,
   (q) a gear
   (r) rotatably
   (s) mounted thereon and
   (t) meshing with one of the intermediate gears, and
   (u) a clutch mounted on the second driven shaft for engaging or disengaging said gear.

Claims 2 and 3 are, for all practical purposes, identical with claim 1.

All Timken devices, with the exception of T-43-p-1 and T-43-v-1, are free of the first three claims, because none of them have an internal declutching mechanism for the secondary output shaft (u). The two exceptions mentioned have substantially the kind of clutch specified, except that additively included is an automatic mechanism which engages the secondary output shaft when the motor is accelerated to a speed faster than that of the wheels and disengages it when the motor is decelerated. This is not enough to take them out of the coverage of claims 1, 2 and 3, and these two infringe those claims.

Claim 4 differs from claim 1 only in that it is specified that the clutch (u) shall be "for selectively driving the second driven shaft." In the light of the specification this must mean that the clutch shall be manually operated and under the selective control of the operator. Thus, all the Timken devices are free of claim 4, including the two having the automatic clutch.

Claim 5 includes all the elements of claim 1 except the internal clutch (u) and, as a corollary, (r). If the clutch is omitted, the gear, of course, must be fixed by being splined or keyed upon the secondary drive shaft instead of revolving upon it on bearings; otherwise it would not transmit power to it at all. Claim 5 also specifies that the secondary output shaft (p) shall be "connectible at one end with a shaft leading to front traction wheels." All the Timken transfer cases infringe claim 5 except the nine eliminated or reserved at the beginning of this discussion.

Claims 6, 8 and 11 specify only the four shafts of claim 1 [(a), (b), (c)—and, in 11, (e)—(p) and (i)] and "gears for simultaneously transmitting power" between them "selectively operable to disconnect" them. It is also specified by 6 and 8 that the three shafts shall be parallel and in the same plane. Claims 6, 8 and 11

upon their terms are fully anticipated by the prior T-9 and Reif, No. 1,296,216, March 4, 1919. There is no novelty in these claims, unless they can be limited to a construction in which the elements described as "gears for simultaneously transmitting power" are confined to the particular arrangement disclosed by the specification. The claims at hand are not unlike the usual means claim, and their effect would be very little changed if "means" or "gearing means" had been used instead of "gears" for transmitting power. Just as, in some cases, a claim may be limited by the specification to save it from invalidity, so here I think we may do the same thing, in applying the doctrine of the Formica case, in order to determine their novelty. So construed the claims are novel and infringed by the Timken transfer cases (except the nine eliminated or reserved) because all employ the four-shaft arrangement of 6, 8 and 11 and the gearing arrangement of the specification.

■ 7 and 9 are essentially the same as 5 [claim 1 without internal clutch (u)] except that they do not specify that the secondary drive shaft shall go to the front wheels. Thus all the Timken transfer cases (except the nine eliminated or reserved) infringe these claims.

■ Claim 10 is for the two upper shafts [(a), (c), and (e)], the second having internal clutch teeth [(f) and (g)], a counter-shaft (i), upon which a gear is mounted (j), and a shiftable gear on one upper shaft [(m), (n) and (o)]. Precisely this arrangement is seen in Church, No. 1,253,670, January 15, 1918, and in Huff, No. 1,075,650, October 14, 1913.

If read without reference to the specification, claim 10 is not only not a four-wheel drive transfer case but is not a power transmitting mechanism at all. There is no second driven shaft (p), and the first (or upper) driven shaft (b) is not described as a power or power output shaft. Unless construed as a subcombination in a power transmitting mechanism its scope would be far outside the whole purpose and intent of the patent. If it be limited to a subcombination in which the pair of axially aligned shafts described consist of a power input and a power output shaft it would be a power transmitting mechanism. But such a limitation leaves the counter-shaft with no function at all in a power transmitting mechanism. However, if it be construed in the light of the specification, as a subcombination in a transfer case having a third or lower shaft (p) and the Ruggles and Smith gearing for transmitting power to it, it becomes a novel combination and a power transmitting mechanism in which all parts function. I think it must be so limited. As so construed the four Timken transfer cases in which the upper aligned shaft is capped infringe claim 10.

If no limitation at all, by reference to the specification, be imposed upon this claim we reach the point where the distinction which the Court spoke of in the Formica case—that is, using the prior art to construe and narrow a claim without letting it affect its validity—remains nice but becomes unworkable. The situation is that of a claim, completely anticipated by the prior art. The Court in Swan Carburetor Co. v. General Motors Corporation, D.C., 42 F.2d 452, 454, seized one horn of the dilemma and ignored the prior art. Judge Westenhaver said: "If defendant may not show invalidity to escape payment of royalties, a practical difficulty exists when one comes to apply the rule permitting the claims to be limited to avoid the prior art. If that art shows the claims to be invalid, the licensee is estopped from denying validity and must pay royalties. If that art only shows that the claims may be still upheld as valid if narrowly limited, then the licensee is not so estopped, and does not have to pay." Somehow, this does not seem to be a very satisfactory solution. However, it is not necessary to attempt to offer a substitute because I think that claim 10 can be properly limited as has been done. At any rate, the result reached is the same as though the method of Swan Carburetor case was used.

■ Claim 12 specifies merely the four shafts of claim 1 [(a), (b), (c), (e), (i), (p)], "power transmitting means" between them, and "a jaw clutch splined upon said power input shaft and selectively engageable with teeth provided on said primary power output shaft." Precisely this combination is embodied in Reif, No. 1,296,216, March 4, 1919. So, again (as with claims 6, 8 and 11), the claim must be limited to the novel combination where the "power transmitting means" consists of the gearing disclosed by Ruggles and Smith. Even as so limited, however, all the Timken transfer cases not eliminated or reserved would infringe. True, the Timken devices use a gear clutch, but this device is either

included in the term "jaw clutch" or is a structural equivalent. The scope of the term "jaw clutch" is quite broad, and no attempt was made in the evidence to define it definitely. However, even if the Timken type clutch would not be included by the term as generally used in the art, the plaintiff is hardly in a position to deny that the two are interchangeable as a matter of choice, since that was its exact contention in connection with its argument based upon alleged priority of Spicer.

Judgment in accordance with the foregoing.

The statements of fact and law in the foregoing opinion may be taken as special findings of fact and conclusions of law.